Lori D. RHOADS, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION As Receiver for Standard
Federal Savings Bank, et al., Defen-
dants.

Civil No. K–94–1548.

United States District Court,
D. Maryland.

Feb. 22, 1997.

Fred Sommer, Rockville, MD, for plaintiff.

Robert P. Fletcher, Garrett S. Flynn, Nixon, Hargrave, Devans & Doyle, L.L.P., Washington, D.C., for F.D.I.C. as Receiver for Standard Federal Sav. Ass'n and as Receiver for Standard Federal Sav. Bank.

FRANK A. KAUFMAN, Senior District Judge.

In this case, Lori D. Rhoads, the plaintiff, asserts several claims against the Federal Deposit Insurance Corporation ("FDIC") as the receiver of her former employer Standard Federal Savings Bank ("SFSB"), and Standard Federal Savings Association ("SFSA"), all of which were triggered by her termination for excessive absences. Plaintiff asserts her absences from work were justified due to severe asthma and migraines, and protected by two federal statutes, the Americans With Disabilities Act, 42 U.S.C. §§ 12101–12117 ("ADA") and the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654 ("FMLA"), which establish federal question jurisdiction in this case. In its entirety, Rhoads's suit involves the following:

(1) Failure to make reasonable accommodations under the ADA (Counts II and VIII);

(2) Retaliation under the ADA (Counts II and VIII);

(3) Interfering with, restraining, and denying plaintiff's exercise of her rights under the FMLA (Count I);

(4) Violation of Montgomery County Human Rights Law (Counts III and IX);

(5) Violation of a Maryland common-law "duty to provide a safe workplace" (Counts V and X); and

(6) Failure to pay accrued vacation pay in breach of an alleged employment agreement and the Maryland Wage and Payment and Collection Law (Counts VI and VII),

Counts I to III and V to VII are against the FDIC as Receiver for SFSA, plaintiff's employer from October 21, 1992 through September 15, 1993.[1] Counts VIII to X are against the FDIC as Receiver for SFSB, plaintiff's employer prior to October 21, 1992.[2] Before this Court are the defendants' summary judgment motion with regard to all of plaintiff's claims, and plaintiff's cross-motion for summary judgment with regard to Count I of her complaint (her FMLA claim against the SFSA), her claim for payment of unused vacation pay (Counts VI–VII), and SFSA's defense based on allegedly "after-acquired evidence" For the reasons discussed in this Opinion, defendants' summary judgment motion will be denied in-part and granted in-part, and plaintiff's summary judgment motion will be denied.

## I.  Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue of material fact and [where] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). While the non-moving party is entitled to have "all reasonable inferences ... drawn in its respective favor," Felty v. Graves–Humphreys Co., 818 F.2d 1126, 1129

(4th Cir.1987), the non-movant, in resisting summary judgment, must "go beyond the pleadings and by [its] own affidavits.... depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate, therefore, where there is no genuine issue of material fact that could lead a rational trier of fact to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II.  Statement of the Facts

Rhoads, a financial analyst, went to work for SFSB in September of 1987. Rhoads continued her work for SFSB and its successor SFSA, with a brief interruption from January, 1990 to February, 1991, until her termination on September 15, 1993. (Rhoads Dep. at 44.) Rhoads suffers from asthma, a chronic respiratory condition, and from severe migraines. (Rhoads Decl. ¶ 2.) Plaintiff's asthma and migraines are triggered by cigarette smoke. (Rhoads Decl. ¶ 5.) While working for the SFSB, and its successor, plaintiff was repeatedly exposed to cigarette smoke due to smoking among co-workers in the office. (Rhoads Dep. at 125–28.) Internal memorandums documented the negative effects plaintiff's exposure to cigarettes was having on her health. (Jones Dep. Ex. 10) ("As recently as February 18th Ms. Rhoads, was in the office and RTC officials were smoking. Ms. Rhoads became extremely ill due to smoke."); Rhoads Dep. Ex. 9 ("The smoking is having a devastating health effect on one of my employees. She is suffering pneumonia, bronchitis and several other adverse illnesses. Please stop smoking immediately."). Apparently, as a result of management's inability to control smoking among

---

**1.**  During the relevant period in this case, namely October 21, 1992 through September 15, 1993, the Resolution Trust Corporation ("RTC") acted as conservator for the SFSA, however, since that time, effective June 30, 1995, the Office of Thrift Supervision ("OTS") appointed the RTC receiver for SFSA. Following this substitution of the RTC as receiver for SFSA, the RTC was statutorily terminated and succeeded by the FDIC. The par-

ties in this lawsuit have been appropriately converted.  (See Order of May 14, 1996.)

**2.**  The RTC was appointed receiver of SFSB on October 21, 1992 by the RTC. Since that time, as discussed *supra*, the FDIC has replaced the RTC, and the parties in this lawsuit have been appropriately converted.

employees in the office, and hence, to aid in the improvement of Rhoads's health, Rhoads was allowed to work at home from May to August of 1993.[3] (Muniz Dep. at 42; Rhoads Dep. at 130.)

Contemporaneous with Rhoads's ongoing struggle to achieve a workable accommodation from her employer with regard to her health conditions, SFSB was placed in receivership by the Office of Thrift Supervision ("OTS") on October 21, 1992, and the RTC was appointed as Receiver for SFSB. On the same day, OTS chartered a new federal mutual savings association, SFSA, and the RTC was appointed as Conservator for the new association. Although Rhoads's employment with SFSB was terminated at its receivership, she was hired simultaneously by the RTC/Conservator for SFSA.[4]

After the RTC intervention, SFSA began to take a more aggressive stance towards personnel matters, such as those involving the plaintiff, and consequently placed a large premium on the requirement that employees work at SFSA offices. (Jones Dep. at 233; Muniz Dep. at 286.) Rhoads was first apprised of that new emphasis on reporting to work, during a meeting at the SFSA's Fredericksburg Operations Center ("FOC") with R. Emmett Garlock, former president of SFSB, and then executive vice president of SFSA on August 12, 1993. (Rhoads Dep. at 303–05.) W. Marshall Jones, SFSA's Vice President of Human Resources, also participated in the meeting. During that meeting plaintiff was told she must report to work at the FOC on August 18, 1993, or qualify for SFSA's disability policy which required medical certification. (Rhoads Dep. at 305, 315.) Plaintiff said she could not report on that date due to her sensitivity to smoke, and its continued prevalence at the FOC. (Id.) In fact, on the way to the meeting, plaintiff

observed employees smoking in the offices adjoining Garlock's office, both exposing her to smoke, and heightening her concerns. (Rhoads Dep. at 309.)

To accommodate plaintiff's concerns, SFSA officials moved the date Rhoads was to report to work to September 1, 1993, to coincide with the date the building became smoke-free. (Swenck Dep. at 24.) Rhoads was informed of that accommodation, and the addition of an air-purifier at her desk, in a letter which Jones sent to her on August 25, 1993. (Rhoads Dep. Ex. 18.) After the August 12, 1993 meeting, however, Rhoads maintains that she suffered a significant relapse of her poor health due to her exposure to smoke during her visit to FOC. Thus, by August 21, 1993, Rhoads suffered from migraines so severe that she sought treatment in a hospital emergency room. (Rhoads Decl. ¶ 10.)

On September 1, 1993 Rhoads called her supervisor to inform him that she was too sick to return to work. Against the aforementioned background, it is the events of the fifteen days stretching from September 1st to September 15th, which are quite critical to this suit.[5] During that period, Rhoads maintained that she was too sick to return to work, and the RTC maintains she did not follow the institution's sick leave procedures, or appropriately establish her illness or disability with medical documentation. The RTC takes the position that Rhoads's disregard of SFSA policies justified Rhoads's termination for excessive and un-excused absenteeism. In that regard, the question arises as to whether the personnel policies of the SFSA should be the sole source of guidance for evaluating the legitimacy of Rhoads's termination, or whether the facts at hand cause the federal workplace mandates of the ADA or the FMLA to be otherwise applied.

**3.** Rhoads's supervisor, Michael O'Hopp, has testified that he in fact allowed Rhoads to work at home, beginning in May of 1993, because of her threats to expose romantic relationships involving O'Hopp and the plaintiff, and O'Hopp and another employee. (O'Hopp Dep. 104.)

**4.** The RTC/Conservator for SFSA, as Rhoads's employer from October 21, 1992 until her termination, will be referred to in the opinion, wherever possible, simply as the SFSA.

**5.** Rhoads was afforded lengthy absences from work in the past, absences approved by supervisors. (Pavlonnis Dep. at 93.) Additionally, the record in this case clearly indicates that Rhoads was considered a valuable employee. She was given significant raises, good performance evaluations, and appears to have performed complex financial analysis upon which her supervisors relied. (Jones Dep. Ex. 8.)

The SFSA sick leave policy, as revealed in this case through witness testimony and exhibits, required employees to notify their supervisors when they could not report to work due to an illness. (Muniz Dep. at 31.) For absences of three to five days, employees were called upon to provide written certification from a doctor stating that the employee is ill and unable to report to work. (Muniz Dep. at 31.) Employees absent for more than ten days were required to ask for disability leave and to back up their request with a note from a doctor stating disability leave was necessary, or face termination, (Rhoads Dep. at 315; Pavlonnis Dep. Ex. 18 at 90062–63.)

While Rhoads notified her supervisor that she was ill and unable to report to work on September 1, 1993, and continued to make subsequent calls, she did not provide her employer with a note from a doctor certifying that she was too ill to work until after the close of business of her eleventh day away from work. (Muniz Dep. at 154.) Rhoads failed to provide a timely letter from a physician even though James Pavlonnis, her immediate supervisor, reminded Rhoads, on her eighth day absent, that an appropriate note was necessary to justify her absence, and Jones sent Rhoads a probation letter on her ninth day absent. (Pavlonnis Dep. Ex. 8; Rhoads Dep. Ex. 24.) Although sick leave was handled on a case-by-case basis by SFSA, and at times SFSA allowed its employees to provide documentation of their illness after they returned to work, witness testimony submitted in this case indicates that SFSA literally reached a breaking point with Rhoads. (Muniz Dep. at 256.) SFSA, it appears, as time went on, strictly applied its sick leave policy to Rhoads, as a result of the leniency which she had been afforded with regard to her attendance in the past. (Garlock Dep. at 15.) This court can find no reason, in the absence of a federal law to the contrary, to question SFSA's full implementation of its policies.

### III.   ADA Claim

In her complaint, plaintiff sets forth various theories under which she contends the defendants have discriminated against her in violation of the ADA, including SFSA's failure to accommodate her disability, unlawful termination, and retaliation. This Court will treat each of these arguments in turn.

#### a.   Failure to Make Reasonable Accommodations

The ADA prohibits employment discrimination against "qualified individual[s] with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). In the context of the ADA, the term discriminate includes: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity...." 42 U.S.C. § 12112(b)(5). Plaintiff asserts that prior to her termination, she requested an ADA accommodation, i.e., the right to "take sick leave while her disability prevents her from working." (Rhoads Opp. at 31.) Rhoads argues that had SFSA afforded her that reasonable accommodation, SFSA should not have terminated her under its own sick leave policies.

To establish her claim for discrimination based on denial of accommodation, Rhoads must demonstrate: "(1) she is an 'otherwise qualified individual with a disability,' i.e., able to perform the essential functions of the job in question with or without reasonable accommodation; and (2) if a reasonable accommodation is necessary, that the denial of the accommodation was made in a discriminatory fashion." *Bryant v. Better Bus. Bureau of Greater Maryland,* 923 F.Supp. 720, 733 (D.Md.1996) (Davis, J.) (citing *Myers v. Hose et al.,* 50 F.3d 278, 281–82 (4th Cir.1995)).

#### i.   Plaintiff's Disability

The RTC argues plaintiff's discrimination claim must fail because she cannot establish that she is a disabled individual. Those regarded as having a disability protected by the ADA are persons with "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impair-

ment; or [who are] regarded as having such an impairment." 42 U.S.C. § 12102(2).

■ Rhoads asserts that she is disabled by reason of two physical impairments, asthma and migraines, which are triggered principally by cigarette smoke, and which substantially limit her major life activities. The Code of Federal Regulations explains "major life activities" as those which an average person can perform with little or no difficulty, such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). The plaintiff has offered testimony that when she suffers from her asthma and migraines, she is unable to work, do things such as drive and sleep, and, is at times substantially limited in her ability to breathe. (Rhoads Decl. ¶¶ 4, 5.)

In employment discrimination suits, the Fourth Circuit requires courts to perform a particularized inquiry into "whether a particular impairment constitutes for the particular person a significant barrier to employment." *Forrisi v. Bowen,* 794 F.2d 931, 932 (4th Cir.1986) (Wilkinson, J.). The defendants point out that when the major life activity at issue is working, the plaintiff must establish she was not only incapable of performing her particular job but that her disability "foreclosed her generally from obtaining jobs in her field." *Gupton v. Commonwealth of Virginia,* 14 F.3d 203, 205 (4th Cir.1994) (Russell, J.), *cert. denied,* 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994). This "foreclosure" test incorporates the ADA requirement that the major life activity impaired for ADA purposes must be significant and severe as compared to conditions more widely shared by the public. *See Forrisi,* 794 F.2d at 933–34. *Cf.* 29 C.F.R. § 1630.2(j)(3) ("With respect to the major life activity of working—(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person...."). Accordingly, the Fourth Circuit *Forrisi/Gupton* foreclosure test appears to serve the useful purpose of narrowing the group of individuals with regard to whom employers should focus their resources, thereby ensuring that only the truly disad-

vantaged reap the rewards associated with the ADA mandate placed on employers to accommodate the disabled.

In this case, plaintiff alleges that she was unable to work in a smoke-filled environment due to the effect smoke had on her breathing and headaches. However, there appears to be no reasonable material or relevant factual dispute concerning the plaintiff's ability to perform her job requirements at a very high level, provided that she is given the opportunity to perform her work in a smoke-free atmosphere, as she did at home from May to August of 1993, or as SFSA offered beginning in September 1, 1993. Thus applying the *Forrisi/Gupton* foreclosure test, Rhoads cannot argue that a class of jobs free from exposure to smoke has been foreclosed as a result of her impairments, and hence, Rhoads cannot show her ability to work is substantially limited. Consequently, as Rhoads's strongest claim of substantial impairment to a major life activity, i.e., her ability to work, fails, Rhoads's claim that she has a disability is fatally weakened. *Cf. Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454–55 (7th Cir. 1995) (doctor's inability to perform medical positions requiring long shifts or 36 hour call duties due to his impaired visual condition did not "necessarily" render him disabled within the meaning of the ADA); *Maulding v. Sullivan,* 961 F.2d 694, 698 (8th Cir.1992) (chemist unable to establish limitations of "major life activities" sufficient to establish disability simply by showing that her sensitivity to certain chemicals restricted only her ability to do lab work), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993); *Wright v. Tisch,* 45 FEP 151, 152–53, 1987 WL 109067 (E.D.Va.1987) (Merhige, J.) (plaintiff who "is not precluded from working indoors where a moderate amount of dust is present," and can take part in outdoor employment, is not a handicapped individual where her dust allergy restricted her only from working in the "unusual, if not unique, environmental conditions of [her workplace]").

The plaintiff, however, strenuously argues application of the foreclosure test to her claim is only a starting point for determining whether or not she is a disabled individual

because she alleges additional major life activities, such as breathing, are effected by the asthma and migraines she suffers when exposed to smoke. *See Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 349 (4th Cir.1996) (per curiam) ("the general foreclosure test applies only to claims brought under the major life activity of working"). On the surface, plaintiff's argument has merit. Indeed, to find otherwise would allow employers to avoid grappling with their responsibility to accommodate employees with a disability that effects numerous aspects of their lives, in contravention of the ADA. However, where the additional major life activities which the plaintiff claims are substantially limited, such as the ability to "breathe," are all triggered solely by her workplace environment,[6] the traditional approach found in the ADA for determining whether such impairments are sufficiently severe to be classified as a disability appears inadequate. In these limited circumstances, the proper inquiry should remain focussed on the extent to which an ADA claimant is capable of successfully pursuing a given vocation with or without reasonable accommodation. *Cf. Mobley v. Bd. of Regents*, 924 F.Supp. 1179, 1187 (S.D.Ga.1996) (rejecting claim that asthma presents an "obvious" impairment to breathing when symptoms would arise only in one workplace).

On a final note, this Court recognizes that in some instances asthma and/or migraines may serve as the basis for a disability claim. *See, e.g., Carlson v. InaCom Corp.*, 885 F.Supp. 1314, 1320 (D.Neb.1995) (disability established with regard to plaintiff who suffered migraines over a period of twenty years, on a monthly basis regardless of her environment which left her incapable of caring for her son, driving or working); *Dutton v. Johnson County Bd. of County Comm'rs.*, 859 F.Supp. 498, 506 (D.Kan.1994) (severe migraines that comprise a permanent, intermittent and unpredictable condition over a twenty year period, and which were unconnected to any particular type of work constituted a disability), *Harmer v. Virginia Elec. & Power Co.*, 831 F.Supp. 1300, 1306 (E.D.Va.1993) (in a decision decided prior to *Gupton*, the court treated severe bronchial asthma as a disability without an extensive discussion of the severity of the plaintiff's asthma outside his particular workplace) This case, however, for the reasons discussed *supra*, is simply not one of those instances.

Finally, this Court rejects Rhoads's alternative approaches for establishing a disability. Rhoads asserts that even if this Court finds she has not established an impairment which substantially limits one or more major life activities, she was "regarded as" an individual with a disability by SFSA, and/or SFSA had a "record of" her disabilities, and therefore her circumstances fall within the definition of an individual with a disability and should be afforded the protection of the ADA. *See* 42 U.S.C. § 12102. The expansive definition of an individual with a disability which Rhoads seeks to establish was adopted to "combat the effects of erroneous but nevertheless prevalent perceptions about the handicapped." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 279, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987) (citation omitted). Plaintiff's approach must fail because to allow plaintiff to utilize either of the alternative definitions for a disabled individual would contort the purpose of those provisions. There is no evidence in this case that the defendants erroneously perceived that Rhoads was substantially limited in her ability to do her job. Rather, the record indisputably reveals SFSA thought the plaintiff was capable of performing her job in a smoke-free environment,[7] and as a result,

---

6. Outside the episodes of asthma and migraines plaintiff alleges she suffered due to her exposure to smoke at work, plaintiff appears to have led a full life in every respect. For instance, unlike many asthma sufferers, plaintiff is able to bicycle and teach ballet dancing when not exposed to cigarette smoke. (Rhoads Dep. 896–97.) Additionally, Rhoads testified that her migraines are completely correlated to exposure to cigarette smoke. (Rhoads Dep. at 905.)

7. SFSA's impression of Rhoads's workplace needs was appropriately based on the assertions of her doctors in numerous letters to SFSA. (Chanales Dep. Ex. 2, Tab A at unnumbered pages 9–12; Rhoads Dep. Ex. 16; Rhoads Dep. Ex. 20.)

moved, at least partially, to create such an environment for her to work.

*ii. Defendants' Reasonable Accommodation*

█ Assuming, *arguendo* only, that Rhoads is a qualified individual with a disability, she has not sufficiently met her burden of proffering that SFSA failed to provide a reasonable accommodation which would allow her adequately to perform her job.[8] *See Tyndall v. National Educ. Centers*, 31 F.3d 209, 213 (4th Cir.1994) (Wilkinson, J.); *Bryant*, 923 F.Supp. at 733. Plaintiff asserts that the ADA accommodation which she sought prior to her termination was the right to take sick leave while her disability prevented her from working. Plaintiff has not established that SFSA failed to accommodate her disability in a discriminatory manner because she has not shown that she made a timely request for her proposed accommodation. Furthermore, the accommodation which Rhoads asks this Court to evaluate is rejected in this case because it is in substance a request not to perform her job, and hence, facially unreasonable.

While it is undisputed that the plaintiff notified SFSA that she suffered from asthma and that, as a result, she required a smoke-free workplace, the record reveals that the plaintiff did not adequately inform SFSA of her recurring problem with migraines, or ask for the use of sick leave or to otherwise be allowed unscheduled absences as an accommodation for migraines. Outside of the papers filed in this case, the first time that

plaintiff appears to have complained about headaches to SFSA was on September 2, 1993 during a telephone call with Jim Pavlonnis. (Pavlonnis Dep. Ex. 18 at 900055.) Further, notes taken by Pavlonnis regarding his conversations with Rhoads during her September absence indicate that plaintiff first requested the use of accrued sick leave to justify her continued absences on September 8th. (Pavlonnis Dep. Ex. 18 at 900057.) Finally, after receiving a note from Rhoads's doctor reiterating Rhoads's asthma condition and need for a smoke-free environment, Pavlonnis called Rhoads on September 10th and asked her if she was requesting disability leave. Rhoads replied that she did not know, and did not feel that she had to decide because she was using accrued sick leave. (Pavlonnis Dep. Ex. 19 at 90066.)

Rhoads asks this Court to allow her to transform her request for the use of accrued sick leave-which request it should be noted did not comply with SFSA's policy that sick leave requests be accompanied by a doctor's note explaining the need for sick leave-into a request for accommodation for a disability, although that latter request was not previously communicated to her employer. This Court declines to stretch the ADA that far, and consequently to require employers to anticipate new disabilities and new accommodations, without adequate information, in order to give absent employees that much benefit of the doubt.

SFSA should not be held liable for an accommodation which it was never requested

---

**8.** Had Rhoads been able to establish such discrimination the burden would have shifted to SFSA to rebut plaintiff's assertion that the accommodation which plaintiff proposed was reasonable or otherwise to establish that plaintiff's accommodation would cause "undue hardship," as defined in 42 U.S.C. § 12111(10), for SFSA. *See Champ v. Baltimore County*, 884 F.Supp. 991, 999 (D.Md.1995) (Hargrove, J.), *aff'd*, 91 F.3d 129 (1996). While accommodation and undue hardship have been treated as two sides of the same coin by many courts, undue hardship has been treated by others as the final test against which an employer's responsibilities will be judged. *Compare Borkowski v. Valley Cent. Sch., Dist.*, 63 F.3d 131, 138 (2nd Cir.1995) ("[M]eeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue

hardship amount to the same thing."), *with, Vande Zande v. St. of Wisconsin Dept. of Administration*, 44 F.3d 538, 543 (7th Cir.1995) (Posner, C.J.) ("The employee must show that the accommodation is reasonable in the sense both of efficacious and of proportional costs. Even if this prima facie showing is made, the employer has an opportunity to prove that upon more careful consideration the costs are excessive in relation either to the benefits of the accommodation or to the employer's financial survival or health."). *See generally, Bryant*, 923 F.Supp. at 733–34 (exploring the relationship between reasonable accommodation and undue hardship). Because the plaintiff, in this case, has failed to proffer significant evidence that she was denied a reasonable accommodation, the more strenuous inquiry of undue hardship is not required.

to make. "The E.E.O.C. regulations provide that '[i]n general ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *Bryant*, 923 F.Supp. at 737 (citing 29 C.F.R. § 1630.9, at 414 (Appendix: Interpretive Guidance)). *See also Beck v. University of Wisconsin Board of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996) (reasonable accommodation claim properly subjected to summary judgment against claimant where employer made efforts to accommodate employee on the information it possessed); *Carlson*, 885 F.Supp. at 1322 (employee, who was terminated for excessive absenteeism, did not make a prima facie showing that employer failed to provide reasonable accommodation, where the employee did not explain to her employer that she suffered from a disability, i.e., migraines, and needed accommodation).

█ Finally, reasonable accommodations under the ADA are those accommodations which allow otherwise qualified disabled individuals to "perform the essential functions" of their job. 42 U.S.C. § 12111(8). Plaintiff asks for an accommodation which defeats her ability to perform a function of her job, namely, attendance. Regular attendance is generally, unless otherwise established, regarded as an essential function of such employment. *See Tyndall*, 31 F.3d at 213 ("In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis."); *Walders v. Garrett*, 765 F.Supp. 303, 309 (E.D.Va.1991) (Ellis, J.) ("in general, employees cannot perform their jobs successfully without meeting some threshold of both attendance and regularity"), *aff'd*, 956 F.2d 1163 (4th Cir.1992). Many courts have found open-ended work schedules to fail as a reasonable accommodation. *Myers v. Hose*, 50 F.3d 278, 282–83 (4th Cir.1995) (Wilkinson, J.) (reasonable accommodation provisions of the ADA do not require employers to "wait indefinitely," providing extended leave, while an employee's health improves); *Carr v. Reno*, 23 F.3d 525, 531 (D.C.Cir.1994) ("[T]o require an employer to accept an open-ended 'work when able' schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd proportions...."); *Kimbro*

*v. Atlantic Richfield Co.*, 889 F.2d 869, 878 n. 8 (9th Cir.1989) (employers legitimate needs rendered it unreasonable to require employer to allow employee to use accrued sick leave intermittently when employee's migraine condition precluded his ability to work), *cert. denied*, 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990).

This court is mindful that the use of accrued sick leave, part-time or modified work schedules may in some cases be an appropriate accommodation. *See* 29 C.F.R. § 1630.2(*o*)(2), § 1630.2(*o*) (Appendix). However, such accommodation was not required in this case. Rhoads had worked at home for over four months when she allegedly requested the use of sick leave as an accommodation. An employer who demonstrates such flexibility towards an employee should be allowed to set reasonable limits on the time which an employee spends away from the office. That is especially true where the employer's request that the employee return to a regular and reliable in-office work schedule comes after instituting the alternative accommodations requested by the employee as a prerequisite to her return to the office.

### b. Unlawful Termination

Typically, to establish a wrongful discharge claim under the ADA, a plaintiff must prove: "(1) she was in the protected class; (2) she was discharged; (3) at the time of discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Ennis v. National Assoc. of Bus. and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir.1995) (Luttig, J.) (citation omitted). Plaintiff's unlawful termination claim fails because she has not proffered evidence with sufficient significance that she was within the class protected by the ADA—as explained above, Rhoads is not a disabled individual. Furthermore, as discussed *supra*, given Rhoads's excessive absence from her job in contravention of her employer's express wishes, Rhoads has not offered sufficient evidence to establish she was meeting her employers legitimate expectations.

### c. Retaliatory Discharge

The ADA prohibits employers from retaliating against employees who enforce their rights under the act. *See* 42 U.S.C. § 12203(a). To establish a retaliation claim under the statute, Rhoads must show by a preponderance of the evidence: "(1)[s]he engaged in protected activity; (2)[her] employer took an adverse employment action against [her]; and (3) a causal connection exists between the protected activity and the adverse action." *Harmer*, 831 F.Supp. at 1308. If the plaintiff satisfies that burden, the burden shifts to SFSA to articulate a legitimate non-retaliatory reason for plaintiff's discharge. *See Ennis*, 53 F.3d at 58; *Harmer*, 831 F.Supp. at 1308. If SFSA satisfies that burden, then the presumptions created by plaintiff's prima facie case disappear, and the plaintiff is left with the ultimate burden of showing that SFSA's reasons for her termination are "unworthy of belief" or that she was in fact terminated in retaliation for engaging in protected activity. *See Harmer*, 831 F.Supp. at 1308.

Prior to plaintiff's termination, she engaged in at least one form of protected activity under the ADA. Rhoads requested that her asthma be accommodated on numerous occasions, apparently by urging her employer to implement a smoke-free workplace. Furthermore, Rhoads threatened legal action to enforce her rights under the ADA during the period preceding her termination. On August 20, 1993, and again on September 13, 1993, plaintiff's attorney wrote SFSA concerning SFSA's demands that plaintiff return to work and expressed the belief that SFSA was not complying with the ADA. (Pavlonnis Dep. Ex. 18 at 900052–53, 900068–69) Assuming, that based on the attorney's participation, that plaintiff proffered sufficient evidence of protected activity to establish a prima facie case of retaliation, SFSA has a clear and articulated reason for terminating Rhoads—unexcused absenteeism. The burden, consequently, returns to Rhoads to establish that she was in fact a victim of discrimination.

In *Ross v. Communications Satellite Corp.*, a Title VII retaliation case, the Fourth Circuit explained that, for an employee to "disprove a legitimate nondiscriminatory explanation for adverse action … he must show that the adverse action would not have occurred 'but for' the protected conduct." *Ross*, 759 F.2d 355, 365 (4th Cir.1985) (Wilkinson, J.).[9] To rebut SFSA's legitimate business reason for her termination, Rhoads testifies that she was told she would regret consulting a lawyer by a SFSA manager and asserts that witness testimony in this case shows that she was treated differently from other employees who requested sick leave without proper medical certification. (Rhoads Decl. ¶ 10; Jones Dep. at 148–150; Muniz Dep. at 256, 285; Garlock Dep. at 15.) Rhoads argues that the testimony she has proffered shows that had she not demanded accommodations and threatened legal action on various instances, SFSA would not have strictly enforced its sick leave policy against her.

The evidence upon which Rhoads relies, while perhaps creating a factual question as to whether her availment of legal representation and requests for accommodation were a factor in her termination, does not in any event, in and of itself, satisfy the Fourth Circuit's "but for" test. "[Initiating legal action under anti-discrimination statutes] does not shield employees from normal sanctions for misconduct. 'It would be incongruous—and certainly not required by law—to give any employee, even one engaged in exemplary efforts to vindicate the law of the land, a stranglehold on a job irrespective of that employee's material, work-related flaws.'" *Ross*, 759 F.2d at 366 (citation omitted).

Particularly, when viewed individually, the evidence which Rhoads proffers is obviously insufficient to meet her ultimate burdens. Jones, SFSA's V.P. for Human Resources, whom Rhoads claims threatened adverse action when she told him she wanted to see a lawyer, was in fact, on the committee which considered her termination, and Jones did

---

**9.** The *McDonnell Douglas, Ross* approach has been incorporated into the review of ADA retaliation claims in this circuit. *See Ennis*, 53 F.3d at 57–58 (referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Harmer*, 831 F.Supp. at 1308.

not vote in favor of termination. (Muniz Dep. at 27; Jones Dep. at 101.) Furthermore, that alleged threat was communicated during the August 12, 1993, meeting in which Rhoads was asked to report to work, and during which she expressed the desire not to do so.[10] After that meeting Rhoads was further accommodated by Jones who agreed to allow her to delay her report date from August 18, 1993, to September 1, 1993 until the FOC was completely smoke-free. (Rhoads Dep. Ex. 18.) Jones, rather than harassing Rhoads, appears to have tried to accommodate her wishes and to have abstained from voting for her termination. In those circumstances, there is a strong inference that Jones had no discriminatory animus against Rhoads.

Finally, Rhoads would have this Court rely on testimony from SFSA managers to conclude that SFSA would not have fired her had she refrained from insisting on accommodation to her disability and pursuing the help of an attorney. Rhoads's arguments, in that regard, may not succeed for two reasons. First, the record shows that her one reasonable request for accommodation, a smoke-free workplace, was met by SFSA, without undue delay, and that her lawyer's letters appear not to have been a factor in the decision to terminate her.[11] Second, each of the SFSA managers who testified that SFSA may have applied its sick leave policy more stringently against Rhoads than other employees, all included the important statement that the disparity in Rhoads's treatment, assuming there was some, was due to her lengthy prior absences—a completely adequate rationalization in the view of this Court.

10. Rhoads's Declaration states this meeting, and alleged threat, took place on August 18, 1993. This is contrary to other testimony proffered in this case. (Jones Dep. at 247.)

11. The first letter sent by Rhoads's attorney, dated August 20, 1993, requested that she not be required to return to work until her workplace was "totally smoke-free, or some other accommodation was identified." (Pavlonnis Dep. Ex. at 900052.) Additionally, the attorney opined that SFSA's smoke-free policy, effective September 1, 1993, might not be a sufficient accommodation for Rhoads. (Pavlonnis Dep. Ex. at 900052.) SFSA met the only reasonable demand in that letter and allowed Rhoads to remain at

Rhoads simply has not proffered sufficient evidence to show given her unique circumstances, i.e., that but for her alleged proffered activity, SFSA would not have chosen to follow its personnel policies. Therefore, Rhoads's retaliatory discharge claim fails. In sum, defendants' summary judgment motion with regard to all plaintiff's ADA claims, both Counts II and VIII, will be granted.[12]

### IV. FMLA Claim

The FMLA prohibits certain employers from discharging or otherwise discriminating against individuals who attempt to exercise a right under the act. 29 U.S.C. § 2615(a). The FMLA provides twelve weeks of unpaid leave for eligible employees suffering from a "serious health condition" which makes them "unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1). A proper FMLA claim requires an employee to show that she had a right to leave under 29 U.S.C. §§ 2611–2612, and that that right was interfered with in violation of 29 U.S.C. § 2615. Defendants have moved for summary judgment with regard to Rhoads's FMLA claim, arguing that Rhoads has not proffered sufficient evidence to resist their assertion that she is not an "eligible employee," and that she does not suffer from a "serious health condition" which resulted in her inability to "perform the functions of her job." Rhoads has cross-moved for summary judgment on that claim.

Before proceeding, it Should be clarified that the regulations to the FMLA make clear that an "ADA[ ] 'disability' and an FMLA 'serious health condition' are different con-

home until September 1, 1993. (Jones Dep. Ex. 18.) The second letter sent by Rhoads's attorney was dated September 13, 1993, and followed after SFSA's decision to put Rhoads on probation.

12. Plaintiff's claims involving failure to accommodate her disability against SFSB also do not succeed because plaintiff is not a disabled individual under the ADA for the reasons stated, *supra*, in this opinion. As to plaintiff's retaliation claim against SFSB, plaintiff has proffered insufficient evidence. Therefore, judgment will be entered with regard to Count VIII, in addition to Count II.

**1252**

cepts, and must be analyzed separately." 29 C.F.R. § 825.702(b). For example, an FMLA qualifying health condition may be sufficiently serious without requiring a demonstration that the condition has substantially impaired a significant life activity. Hence, if Rhoads is considered an eligible employee under the FMLA, she may have had a serious health condition for which she was entitled leave, even though she is not disabled under the ADA.

### a. Eligible Employee

■ This Court concludes that plaintiff is an "eligible employee" within the meaning of the FMLA Act. In order to be an eligible employee under the FMLA, an employee must be employed "for at least 12 months by the employer with respect to whom leave is requested...." 29 U.S.C. § 2611(2). The term employer "includes any successor in interest of an employer...." 29 U.S.C. § 2611(4)(A)(ii)(II). Whether or not the plaintiff is an eligible employee turns on whether or not the RTC and the institution for which it acted as Conservator, the SFSA, is a "successor in interest" to the plaintiff's former employer, Standard Federal Savings Bank ("SFSB"). Although Rhoads's employment with SFSB was terminated after the RTC intervention, she was hired simultaneously by SFSA. Rhoads's length of service for SFSA was just shy of twelve months when she was terminated on September 15, 1993. Therefore, if SFSA is not a successor in interest to SFSB, Rhoads is not an eligible employee under the plain language of the FMLA.

This Court has found no discussion of authority concerning whether or not the RTC is a successor in interest under the FMLA in circumstances such as those present in this case, by any federal court. Therefore, this court looks solely to the federal regulations governing the FMLA. The Department of Labor ("DOL") has issued regulations which address what is meant by "successor in interest." 29 C.F.R. § 825.107.[13] "When an employer is a 'successor in interest,' employees'

entitlements are the same as if the employment by the predecessor and successor were continuous employment by a single employer." 29 C.F.R. § 825.107(c). In order to determine whether or not an entity qualifies as a successor in interest, the regulations provide eight factors for evaluation: "(1) Substantial continuity of the same business operations; (2) Use of the same plant; (3) Continuity of the work force; (4) Similarity of jobs and working conditions; (5) Similarity of supervisory personnel, (6) Similarity in machinery, equipment, and production methods; (7) Similarity of products or services; and (8) The ability of the predecessor to provide relief." 29 C.F.R. § 825.107(a). Those factors are to be viewed in their totality. See 29 C.F.R. § 825.107(b). In the preamble of the final FMLA regulations effective April 6, 1995, the DOL has stated that "[t]he Resolution Trust Corporation can be a covered employer under Title I of the FMLA as a 'successor in interest' of a covered employer when it assumes control over a failing thrift as part of the resolution process." 60 Fed.Reg. 2180, 2181 (Jan. 6, 1995) (Summary of Major Comments). While the DOL's language is not determinative in this case, due to its adoption after the incidents critical to this case, it does, however, at the very least, suggest that the plaintiff's assertion that the RTC/Conservator of SFSA is the successor in interest of SFSB must be examined carefully.

### i. Successor in Interest Analysis

The RTC as Conservator succeeds to "all rights, titles, power, and privileges," 12 U.S.C. § 1821(d)(2)(A), of the failed institution, and may operate the institution "with all the powers of members or shareholders, the directors, and the officers of the institution and conduct all business of the institution." 12 U.S.C. § 1821(d)(2)(B). Further, the RTC as conservator may take such actions "as appropriate to carry on the business of the institution and preserve and conserve the assets and property of the institution." 12 U.S.C. § 1821(d)(2)(D). The plaintiff argues that these provisions indicate Congress' in-

---

**13.** The Secretary released final regulations effective April 6, 1995. See 60 Fed.Reg. 2181 (Jan. 6, 1995). However, the interim regulations govern

the within dispute since Rhoads's termination occurred on September 15, 1993 prior to the effective date of the final regulations.

tention that the RTC as a conservator may "substantially continue" the business of the troubled institutions which it operates to facilitate its preservation. Indeed, there is case law which supports that contention. "[A] conservator operates or disposes of an institution as a going concern...." *Hennessy v. F.D.I.C.*, 58 F.3d 908, 916 (3rd Cir.1995) (quoting from H.R. Conf. Rep. No. 222, 101st Cong, 1st Sess 396 (1989), U.S.C.C.A.N. 1989, pp. 86, 435), *cert. denied,* —— U.S. ——, 116 S.Ct. 1318, 134 L.Ed.2d 471 (1996). To support that argument, it is note-worthy that SFSA continued to operate as a financial institution, until February 25, 1995 when it sold its mortgage servicing operation to First Nationwide Bank. This Court, therefore, is of the view that the RTC substantially continued the business of SFSB, as the conservator of SFSA. However, with regard to the "similarity of products and services" before and after intervention, the record is unclear as to how quickly SFSA began to focus exclusively on selling SFSA's mortgage servicing business and assets, which, according to the RTC, was the principal service which SFSB provided to its clients prior to intervention.[14]

With regard to the second factor in the "successor in interest" analysis, "use of the same plant," this Court finds that the RTC as the conservator of SFSA continued the operations of SFSB in substantially the same facilities which SFSB used, and continuously occupied those facilities during the SFSA conservatorship which began in 1992. While the RTC moved the plaintiff's department to SFSA's main office, the Frederick Operations Center in Frederick, Maryland from the Gaithersburg, Maryland office of the SFSA, which it eventually closed while acting as conservator, the relocation of a department between offices hardly constitutes a controlling significant different type of use of facilities. Furthermore, the subsequent consolidation among offices was not immediate (it did not occur until some time after plaintiff's termination), and was perhaps predictable given the need for the institution to trim

costs and operations due to its financial condition.

Similarly, as to "continuity of the workforce," testimony given in this case suggests that the almost 2,000 member SFSB workforce was hired by SFSA as a result of the RTC's receivership on October 21, 1992 (See, e.g., Pavlonnis Dep. at 17.) While this workforce dwindled during the RTC conservatorship and receivership, it did so due to the natural progression of winding down a failed financial institution. In addition, the "supervisory personnel" at SFSA after the RTC intervention mirrored that of SFSB, with the addition of approximately 20 RTC employees super-imposed over senior management to implement RTC policy. (See, e.g., Swenck Dep. at 14–15.) With regard to the plaintiff, her immediate supervisors, Michael O'Hopp and Jim Pavlonnis, did not change after the intervention.

With regard to "similarity of jobs and working conditions," plaintiff's job before intervention consisted largely of financial forecasting, regulatory compliance, market valuations, and contract negotiations. (Rhoads Dep. at 146–47.) After invention, plaintiff worked almost exclusively on the institution's business plan, a document required by the RTC to operate and manage the supervised institution. (Swenck Dep. at 32.) Although the work-product which Rhoads produced after the intervention changed, her contribution to the business plan mainly involved the financial forecasting and analysis for which she had been known prior to intervention. (Pavlonnis Dep. at 46.)

Finally, with regard to the "ability of the predecessor to provide relief," and "similarity in machinery, equipment, and production methods," neither factor appears dispositive in this case. The first factor serves to insure that FMLA rights accrued under one employer are compatible with work for a successor employer. Where, as in this case, the plaintiff had no FMLA claim against the former employer,[15] the ability of the predecessor to provide relief is irrelevant. The

---

14. The RTC contends that "SFSA's principal product after intervention was the assets of the institution itself" Mem. in Opp. to Plaintiff's Cross–Mot. for Summ. J. at 27.

15. Rhoads FMLA claim did not arise until after the RTC intervention, and furthermore, the FMLA statute was not effective until after the RTC intervention.

factor relating to machinery, equipment and production methods is not addressed in this opinion, as it does not appear significantly to apply in this non-manufacturing context.

In sum, the factors which the DOL regulations leave this Court to utilize in order to determine whether the RTC is a successor in interest for the purposes of Rhoads's FMLA claim, when evaluated either individually or as a whole, lead to the conclusion that Rhoads should be allowed to maintain a FMLA claim against the RTC. Just as the RTC was the successor in interest to the assets of SFSB, it should also be required to stand in the shoes of SFSB with regard to employees who continued their work after the intervention of the RTC. Rhoads's FMLA claim centers on an illness which she suffered in September of 1993, as a result of chronic health conditions—a condition which had been aggravated in her workplace both before and after RTC intervention. Under the RTC, the management involved in working with Rhoads to improve her health and her ability to contribute in her job, remained substantially the same, with the addition of another layer of personnel management from Atlanta after the 1993 changes. That additional layer of management was alerted to Rhoads's ongoing complaints as to the effect smoking in the workplace was having on her health, by internal memos written by Michael O'Hopp, Rhoads's supervisor, during 1993. (Jones Dep. Ex. 10; Rhoads Dep. Ex. 9.) Therefore, not only does the test for successor in interest under the federal regulations weigh in favor of allowing Rhoads's claim, but given the notice which the RTC had of Rhoads's medical condition, this Court concludes under circumstances in the within case, that it is regarded proper to allow the claim of plaintiff to precede.

Given that Rhoads is an eligible employee, the critical issue is whether, in this case, Rhoads has raised sufficient evidence to establish that during the relevant time period: (1) she suffered from a serious health condition which rendered her unable to perform the functions of her job, and (2) the RTC was properly so notified prior to her termination.[16] If Rhoads has not raised sufficient evidence to establish those two prerequisites for a proper FMLA claim, it at least seems appropriate to allow the RTC's own sick leave policy to prevail, and therefore, dismiss Rhoads FMLA claims on those grounds.

### b. Serious Health Condition

A FMLA qualifying serious health condition involves either "inpatient care" at a hospital or similar institution, or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The federal regulations governing the FMLA as to what constitutes a "serious health condition," make it clear that health conditions characterized under "continuing treatment by a health care provider," could very well include both asthma and migraines, as both conditions are specifically mentioned in these regulations. For instance, under the interim FMLA regulations, the qualifying conditions include:

> an illness ... that involves ... [a]ny period of incapacity requiring absence from work ... of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider; or continuing treatment by ... a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days....

29 C.F.R. § 825.114

The final regulations clarify: "A chronic serious health condition is one which: ... [m]ay cause episodic rather than a continuing period of incapacity (e.g. asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.114(a)(2)(iii). Those final regulations go on specifically to exclude migraines from a laundry list of ailments too insignificant for FMLA coverage. 29 C.F.R. § 825.114(c). Additionally, the final regulations state:

> unless the RTC was properly notified of plaintiff's serious health condition, they would have had no reason to call upon her to provide medical certification of her condition.

---

**16.** Plaintiff argues that the RTC's failure to follow the FMLA certification process, laid out in 29 U.S.C. § 2613, precludes the RTC from questioning the seriousness of her health condition. That argument "puts the cart before the horse"—

Absences attributable to incapacity under paragraphs (a)(2)(ii) or (iii) qualify for FMLA leave even though the employee ... does not receive treatment from a health care provider during the absence.... For example, an employee with asthma may be unable to report for work due to onset of an asthma attack or because the employee's health care provider has advised the employee to stay home when the pollen count exceeds a certain level.

29 C.F.R. § 825.114(e).

Thus, both the above regulations and the developing case law on this subject suggest that both asthma and migraines may qualify as a serious health condition under the FMLA. *See, e.g., McClain v. Southwest Steel, Co., Inc.,* 940 F.Supp. 295, 298–300 (N.D.Okl. 1996) (summary judgment not appropriate where plaintiff contended absenteeism was the result of chronic nausea, diarrhea, severe headaches and other similar health problems); *Hendry v. GTE North, Inc.,* 896 F.Supp. 816, 827–28 (N.D.Ind.1995) (summary judgment not appropriate where plaintiff's headaches created a genuine issue of fact as to whether plaintiff had a serious health condition which rendered her unable to perform the functions of her job).

Rhoads has a well documented chronic health condition, namely asthma, and the record clearly shows she suffered from episodic periods of incapacity involving the inability to breathe freely and involving migraines. Rhoads, in sworn testimony, states that when she had asthma or migraines, she was limited in her ability to perform everyday activities, including her ability to drive, work, and, at the most basic level, breathe. (Rhoads Decl. ¶¶ 3–4.) Doctors involved in Rhoads's treatment confirm that when suffering from asthma she was unable to perform her job. (Chanales Dep. at 114–15.)

During the critical period of September 1st to the 15th, Rhoads asserts that she suffered from migraines and lingering respiratory problems, as a result of her exposure to smoke during her meeting at the RTC on August 12, 1993. (Rhoads Dep. at 339.) Prior to September 1st, Rhoads sought medical consultation and treatment from Dr. Captain on August 12th, in particular with respect to treatment of her migraines (Rhoads Dep. at 340), from Dr. Chanales on August 17th and 31 st to treat her asthma (Chanales Dep. at 132, 164), from Shady Grove Adventist Hospital on August 21st, to treat a severe migraine (Rhoads Dep. at 442–43), and from Dr. Gauldi on August 23th, to treat her migraines (Gauldi Dep. at 11). Rhoads was given a variety of medications at varying dosages, by those physicians, and that hospital during August and September, to control her asthma and migraines.[17] Unfortunately, it appears that the medication which Rhoads took for asthma triggered or compounded her migraines. (Chanales at 81–82; Chanales Dep. Ex. 10.)

During Rhoads's August 17th office visit to Dr. Chanales, Dr. Chanales recorded that although Rhoads was not suffering acute asthma during her office visits, lie understood her to be suffering from that condition through observation and by taking her patient history. (Chanales Dep. 134–37.) However, after Rhoads's August 31, 1993 office visit, Dr. Chanales noted: "Impression: 1. Asthma somewhat worse due to lack of medications. 2. Migraine headaches quite severe." (Chanales Dep. Ex. 10.) As a result of those office visits, Dr. Chanales wrote two notes for Rhoads, one dated August 18, 1996 and one dated September 2, 1993, both recommending she work in a smoke free environment. (Rhoads Dep. Ex. 16; Rhoads Dep. Ex. 20.) Those items, intended as information for the SFSA, however, did not specifically reference Rhoads's then current medical condition.

17. Dr. Captain prescribed Fiorinol with Codeine to control Rhoads's migraines. (Rhoads Dep. at 418; Chanales Dep. Ex. 2.) Dr. Chanales prescribed inhalants and nose spray (Ventolin, Beclovent and Nasacort. (Rhoads at 416; Chanales Dep. Ex. 2.)) Rhoads was administered Imitrex, Demoral and Vistaril by the attending physician at Shady Grove Adventist Hospital to combat her severe migraine on August 21st. (Chanales Dep. Ex. 2.) Dr. Gauldi prescribed Pamelor, Imitrex and Toradol. (Chanales Dep. Ex. 2.) Those medications had complicated effects on Rhoads and were adjusted periodically from late August until the middle of September, in order to minimize their negative side effects. (Chanales Dep. Ex. 2.)

Dr. Gauldi, a neurologist, examined Rhoads on August 23rd, following up on her severe migraine episode of August 21st. After that visit, he noted that Rhoads had controlled her recent headaches with Fiorinal, and that he had advised her to discontinue that medication and to pursue a course of medication including Pamelor and Toradol, medications which he noted might take as long as two weeks to take effect. (Gauldi Dep. Ex. 3.)

After September 1st, Rhoads was not seen again by a doctor until after her termination by SFSA. However, from September 1st to the 15th, Rhoads insists that her headaches continued and that she did not feel well enough to work.[18] (Rhoads Dep. at 450–53, 488, 514.) Rhoads's testimony, coupled with the inferences raised by the notes taken by Dr. Chanales on August 31, 1993, creates a genuine issue of fact as to whether from September 1st to the 15th, Rhoads suffered from a serious health condition which rendered her unable to perform her job.[19]

*c. Notice Requirements under the FMLA*

■ Finally, defendants may not be penalized under the FMLA, unless Rhoads gave them sufficient notice that she was incapacitated and unable to work. On September 1, 1993,[20] Rhoads was asked to report to work after being allowed to work at home from May, 1993 to August, 1993.[20] From September 1st forward, Rhoads notified SFSA, in a potentially FMLA appropriate manner, on numerous occasions that she was too ill to report to work. On September 1st, Rhoads called her supervisor, Pavlonnis, and informed him that she had a headache, did not feel well enough to come to work, and expected to be absent for one week recuperating. (Rhoads Dep. at 451, 463–64.) That conversation is augmented by notes taken that day by Pavlonnis. (Pavlonnis Dep. Ex. 18.) Rhoads gave notice again on September 8th, indicating she still did not feel well enough to work. (Pavlonnis Dep. Ex. 5.) On September 9th, SFSA received a note from Dr. Chanales, dated September 2, 1993, indicating that Rhoads must work in a smoke-free environment or be allowed disability leave. (Muniz Dep. at 129.) On September 13th, Rhoads, having received a probation letter from SFSA, spoke to Dr. Chanales about her condition and secured a further letter from the Chanales stating:

[Rhoads] continues to require treatment for her asthmatic disease which has been exacerbated by exposure to smoke on your premises. This treatment has been complicated by the development of severe headaches as a side effect of some of the medications that are being used to treat her asthma. She still is not in good enough shape to return to work, and I certainly continue to maintain that she should not be allowed in your work place

---

**18.** It should be noted that Rhoads did work periodically during August. (Rhoads Dep. at 392.) From the perspective of the FMLA analysis in this opinion, however, Rhoads's ability to work does not become critical until after September 1, 1993. The RTC argues that Rhoads demonstrated her ability to work after September 1, 1993, by writing them letters regarding her condition, faxing them documents and making phone calls. At best, that evidence, when weighed in the light of the medical testimony in this case that both migraines and asthma are conditions which often debilitate those who suffer from those conditions on a sporadic, hour by hour basis, creates a significant disputed issue of fact.

**19.** Rhoads argues that the SFSA sacrificed its ability to challenge the seriousness of her illness by not following the medical certification procedures of the FMLA, and therefore that she is entitled to summary judgment with respect to her FMLA claim. There is simply no authority for that claim in this Circuit or elsewhere. Furthermore, those procedures guide employers at their option under the statute, "[a]n employer *may* require that a request for leave under paragraph (C) or (D) of section 2612(a)(1) of this title be supported by a certification issued by the health care provider of the eligible employee. . . ." 29 U.S.C. § 2613. While such certification may protect an employer with regard to disputes over the seriousness of a health condition, the lack thereof, in the absence of an otherwise viable FMLA claim, is surely insufficient to establish an FMLA violation.

**20.** Rhoads was allowed to work at home during that period in order to avoid exposure to smoking in the offices of SFSA. (Muniz Dep. at 42; Rhoads Dep. at 130.) Although, Rhoads worked at home, she performed all her duties, (Rhoads Dep. at 129–31), and was given an excellent performance review as late as July, 1993. (Jones Dep. Ex. 8.)

unless it is certifiably free of cigarette smoke.

(Chanales Dep. Ex. 2.) It should be noted, however, that Dr. Chanales did not see plaintiff from September 1st to September 13th. (Chanales Dep. at 178–179). In addition, Dr. Chanales letter was not received until after SFSA terminated Rhoads. (Muniz Dep. at 154.)

An employee seeking FMLA leave "shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA–qualifying leave, and the anticipating timing and duration of the leave." 29 C.F.R. § 825.302(c). However, as the Fifth Circuit stated in *Manuel v. Westlake Polymers Corp.*, "[t]o require the employee to designate her leave as pursuant to the FMLA would render these provisions meaningless, if not directly contradict them." 66 F.3d 758, 762 (5th Cir.1995). Further, the interim regulations provide:

> In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA–qualifying, based on the information provided by the employee. In any circumstance where the employer does not have sufficient information about the reason for an employee's use of paid leave, the employer should inquire further to ascertain whether the paid leave is potentially FMLA–qualifying.

29 C.F.R. § 825.208(a)(2).

The burden on employers is not so onerous as that rule might indicate, as employers, once given notice of the request for potentially FMLA qualifying leave, may require the employee to provide certification from a physician. *See* 29 U.S.C. § 2613(a). If the employer has reason to doubt the validity of the certification provided by the employee, which no doubt would have been the situation in the within case, the employer may ask for a second opinion from a different physician. *See* 29 U.S.C. § 2613(c). Where there is a

dispute between the medical opinions, the act provides further resolution procedures. *See* 29 U.S.C. 2613(d)–(e). SFSA, however, chose to terminate Rhoads on her eleventh day away from work, rather than to wait for Dr. Chanales's medical certification of her illness to arrive, and assess its legitimacy.[21] Indeed, the record reveals that had SFSA received Dr. Chanales's letter prior to terminating Rhoads, its termination decision would not have changed, as more than one witness stated Rhoads was fired because SFSA simply did not believe she was sick. (Muniz Dep. at 38, 53–54; Jones Dep. at 131.)

SFSA chose not to follow procedures required by the FMLA because it did not consider itself constrained by the FMLA. However, this Court, having determined that Rhoads was an eligible employee—counter to the RTC's conclusion—is bound to apply the FMLA to these facts. While the Court agrees with the RTC that Dr. Chanales's September 2, 1993 note was insufficient to give the SFSA notice that Rhoads was suffering from a serious health condition,[22] Rhoads has created a genuine issue of disputed fact as to whether the verbal notice which she gave Pavlonnis oil September 1st, 8th, and on successive days, given SFSA's awareness of her chronic health conditions, was sufficient reasonably to apprise SFSA that plaintiff wished to take time off due to a serious health condition.

In sum, Rhoads has created a disputed issue of fact with regard to whether she suffered from serious health condition, and as to the adequacy of the notice which she gave SFSA that her leave was within the protection of the FMLA.

## V. Plaintiff's State Law Claims

### a. Montgomery County Human Rights Law

In her complaint, Rhoads asserts the defendants' violated the Montgomery County

**21.** Under the FMLA regulations in effect in 1993, employers requiring medical certification give employees 15 calendar days to provide the requested certification. 29 C.F.R. § 825.305(a). Even assuming Pavlonnis first requested a doctor's note from Rhoads on September 1, 1993, such a letter was provided on September 15, 1993. While the letter arrived after business hours, said medical certification provided outside the regular business day is hardly significantly inadequate.

**22.** Dr. Chanales September 2, 1993 note, unlike his later September 13, 1993 note, did not reference Rhoads's current medical condition or state she was too ill to report to work.

Human Rights Laws ("MCHRL"), and Md. Ann.Code. Art. 4913, § 42 (1957),[23] by "failing to reasonably accommodate Plaintiff's known handicap, by discharging her and by the other actions set forth." (Am. Compl. ¶ 73.) Plaintiff, however, cannot state a claim against SFSA because the place of plaintiff's employment during August and September of 1993 was Frederick County. (Swenck Dep. at 8–9, 28; Muniz Dep. at 84; Pavlonnis Dep. at 100, 106; O'Hopp Dep. at 112; Rhoads Dep. at 267.) Therefore, the events around which Rhoads's MCHRL complaint revolves—discipline and termination for excessive absenteeism—occurred in Frederick County, and hence, do not provide a basis for a MCHRL claim.

■ In addition, Rhoads's MCHRL claim against either SFSA or SFSB must fail because it is duplicative of her ADA claim. The MCHRL includes an explicit policy statement that prohibits the filing of claims under the MCHRL, where those claims are treated adequately by similar state or federal statutes:

> The prohibitions in this article are substantially similar, but not necessarily identical, to prohibitions in federal and state law. The intent is to assure that a complaint filed under this article may proceed more promptly than possible under either federal or state law. It is not county policy, however, to create a duplicative or cumulative process to those existing under similar or identical state or federal laws.

MCHRL § 27–1(c). While the ADA is not identical to the MCHRL, it is substantially similar. Therefore, this Court will grant the defendants' summary judgment motion with regard to Counts III and IX, plaintiff's MCHRL claims.

*b. Maryland Common Law "Duty to Provide a Safe Workplace"*

■ Rhoads alleges that defendants breached a common-law "duty to provide a safe workplace," by exposing her to cigarette smoke in the workplace, and consequently, causing her severe physical illness. (Am.

Compl. ¶¶ 82–87, 111–16.) The defendants argue that plaintiff's tort claims against SFSA and SFSB are barred by the Maryland Worker's Compensation Act ("WCA"), Md. Lab. & Emply. Code Ann. §§ 9–501 to 9–1201 (Supp.1994). Indeed in most instances, the WCA is the exclusive compensation mechanism for employees injured in the course of their employment, i.e., it precludes other claims. *See Brady v. Ralph M. Parsons Co.*, 327 Md. 275, 278, 609 A.2d 297 (1992); Md. Lab. & Employ. Code Ann. § 9–509.

The Maryland WCA is applicable to claims for "accidental personal injuries." The WCA defines an "accidental personal injury" as:

> (1) an accidental injury that arises out of and in the course of employment;
>
> (2) an injury caused by a willful or negligent act of a third person directed against a covered employee in the course of employment of the covered employee; or
>
> (3) a disease or infection that naturally results from an accidental injury that arises out of and in the course of employment, including:
>
> (i) an occupational disease, and
>
> (ii) frostbite or sunstroke caused by a weather condition.

§ 9–101. Applying this definition to the facts of this case, the defendants assert plaintiff's workplace injuries due to cigarette smoke are accidental injuries and therefore, a tort claim based on these injuries may not proceed.

■ An accidental injury, under Maryland law, is "some unusual and extraordinary condition or happening in the employment not usually and naturally incident thereto." *Holbrook v. GM Assembly Division, General Motors Corp.*, 15 Md.App. 425, 430, 291 A.2d 171 (1972). As smoking was banned in the areas in which Rhoads worked, its occurrence in violation of SFSB and SFSA rules, and applicable building codes, could be considered unusual and extraordinary. The fact that the majority of plaintiff's claimed injuries were, in plaintiffs own

---

**23.** Montgomery County laws prohibit discrimination against disabled persons. Montgomery County Ord. § 27–19 (Repl.Vol.1994). Maryland state law, through Article 49B, gives a plaintiff a cause of action in state court under the MCHRL. Md. Ann.Code Art. 49B, § 42 (1957).

words, the result of "prolonged exposure to cigarette smoke at SFSA's offices," (Pl.'s Opp. at 58), does not automatically put these injuries outside the scope of WCA coverage. A WCA covered injury may be caused by conditions "extending over a substantial period of time; it need not be suddenly incurred." *Holbrook,* 15 Md.App. at 432, 291 A.2d 171. *See also Union Mining Co. v. Blank,* 181 Md. 62, 78, 28 A.2d 568 (1942).

Plaintiff was exposed to smoking at work, and the plaintiff's work environment was the responsibility of her employer. SFSB and SFSA were cognizant of Rhoads's acute sensitivity to secondhand smoke, and allowed the conditions which caused her injury to persist. In these circumstances, this Court concludes that the plaintiff's injuries were the result of conditions she suffered in the "course of her employment," and thus, should be regarded as accidental personal injuries. WCA § 9-101. Though Maryland courts have yet to directly treat the issue presented in this case, this Court believes a finding that plaintiff's injuries are outside the WCA would controvert the principles underlying Maryland law. Therefore, defendants' summary judgment motion in connection with Counts V and X of plaintiff's complaint is granted.

### c. *Failure to Pay Accrued Vacation Pay*

In Counts VI and VII of plaintiff's amended complaint, Rhoads seeks recovery for $4,504.14 in "accrued unused vacation pay" allegedly accrued as of the date of her termination. (Am. Compl. ¶¶ 93, 98.) In Count VI, she bases her claim on the Maryland Wage Payment and Collection Law. Md. Labor & Code Ann. §§ 3-501 to 3-509 (Supp. 1994). In Count VII, Rhoads alleges a common law breach of an employment agreement. Both of these claims fail as a matter of law.

■ Rhoads's statutory claim fails because her allegedly accrued vacation pay was no "compensation that is due to an employee for employment." MD. LABOR & EMPL.CODE ANN. § 3-501(c). At the time of Rhoads's termination, SFSA's personnel policies clearly stated that employees terminated for cause were not due cash representing ac-

crued vacation pay. (Rhoads Dep. at 1092-93; Jones Dep. at 50; Rhoads Dep. Ex. 2 at 8.)

■ With regard to plaintiff's contract claim, Rhoads's essential argument is that she had accrued vacation pay which ripened as earned, and that therefore, was payable like any other wages on termination under a vacation pay policy represented in SFSA's employee manual dated April 1, 1986. (Rhoads Decl. Ex. B at 2.40 ("Persons who are discharged are not entitled to payments other than earned compensation and earned but unused vacation and are not entitled for rehire.").) In so arguing, plaintiff attempts to put aside SFSA's August 15, 1993 modification to its employee manual which specifically denies accrued vacation pay to those terminated for cause (Rhoads Dep. Ex. 2 at 8 ("If you are terminated for cause by the Association, payment for accrued vacation leave is forfeited").) This Court notes, however, that under either manual the payment of accrued vacation pay was only due at separation. At no time could employees demand the cash value of their accrued vacation pay during their employment. (Jones Dep. at 50.) Given this fact, whether or not Rhoads is entitled to her accrued vacation pay must turn on the personnel policy in effect at the time of her termination.

■ Under Maryland law, provisions added to an employee manual after an employee is hired apply to that employee because it is understood that the employee consents to the policy modification by continuing to work. *See Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 240 (4th Cir.1991) ("All employees expect to be covered by the personnel policies of the company in existence at the time of their current work, not when they were hired twenty years ago ... Moreover, an employer expects to treat all its employees according to the same basic benefit rules, and not apply a hodgepodge of rules based on the starting date of the employee."); *Castiglione v. Johns Hopkins Hosp.,* 69 Md.App. 325, 334 n. 4, 517 A.2d 786 (1986), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987). Therefore, Rhoads's vacation pay claim must be evaluated with

reference to the August 15, 1993 manual, and under this manual it must be denied. (Rhoads Dep. Ex. 2 at 8.) Whether or not Rhoads had a copy of the policy modification with regard to accrued vacation pay is irrelevant to determining entitlement to benefits. *See Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1141 (3rd Cir.1993), *cert. denied,* 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994). Furthermore, the fact that Rhoads did not report to work at SFSA does not negate her consent to the August 15, 1993 modification to the vacation pay policy. Rhoads was ostensibly working at home until September 1, 1993 and after this point she remained at home due to her illness Neither action implies her lack of consent, rather, Rhoads alleges had she not been terminated she would still be working for SFSA's successor today. Consequently, defendants' summary judgment motion in connection with Counts VI and VII of plaintiff's complaint is granted.

### VI. Damages

Assuming Rhoads was unlawfully terminated under the FMLA, the defendants assert three grounds for limiting Rhoads's lost wages: (1) the after-acquired evidence doctrine cuts off Rhoads's damages as she would have been terminated for misconduct; (2) Rhoads's job would have been abolished within three months of her termination; and (3) Rhoads would not have been hired by the company that bought SFSA's assets in February 1995. Rhoads has cross-moved for summary judgment on the defendants' after-acquired evidence defense.

Additionally, the defendants argue federal law precludes the recovery of the liquidated damages prescribed by the FMLA against the FDIC as a receiver. This Court will address each of these arguments in turn.

#### a. After-Acquired Evidence

■ Both the defendants and the plaintiff have moved for summary judgment with regard to the defendants' lost wages defense under the after-acquired evidence doctrine. This doctrine, as recognized by the Supreme Court, limits the recovery of plaintiffs if after their unlawful termination, their employer learns of wrongdoing "of such severity that the employee in fact would have been terminated on those grounds alone...." *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, ———— ——, 115 S.Ct. 879, 886–87, 130 L.Ed.2d 852 (1995). The defendants assert that the plaintiff secretly taped conversations she had with her supervisors in violation of Maryland's wiretapping statute, MD. CTS. & JUD. PROC. CODE ANN. § 10–402 (Supp. 1994); and that had they been aware of Rhoads's tape recording prior to her termination for excessive absenteeism, Rhoads would have been terminated for this conduct alone. After reviewing the record in this case, this Court concludes that there are relevant and material disputed issues of fact both with regard to whether or not SFSA had knowledge of plaintiff's wrongful conduct prior to her termination, and whether or not SFSA "would" have terminated her for her secret tape recording.

#### b. Plaintiff's Job was Abolished

■ The defendants argue that plaintiffs lost wages, should such an award be proper, must be limited because her job was abolished either by the SFSA or when the RTC sold the remainder of SFSA's assets to First Nationwide. Putting aside the defendants' argument that SFSA eliminated plaintiff's job shortly after she was terminated due to the presence of disputed facts, this Court concludes that tie defendants' back pay liability was severed after February, 1995 when the remainder of SFSA's assets were sold to First Nationwide.

■ The purpose of back pay is to restore a plaintiff in an employment discrimination case "to the position she would have occupied but for the discrimination." *Patterson v. Greenwood School Dist. 50,* 696 F.2d 293, 295 (4th Cir.1982). Certainly, if the plaintiff's job ceases to exist so must any back pay liability. Plaintiff's job with SFSA assuredly would have been eliminated when what remained of SFSA was sold to First Nationwide in February, 1995. Furthermore, Rhoads's argument that SFSA retained liability for back pay even after its sale to First Nationwide is unavailing. The record in this case sufficiently establishes

that Rhoads would not have been among those SFSA employees offered positions by First Nationwide in 1995. (Pavlonnis Decl. ¶¶ 5–12; Jones Dep. at 36–41.) Rhoads served SFSA as a financial analyst, a function handled almost exclusively by First Nationwide's corporate headquarters in San Francisco, California. (Id.; Swenck Dep. at 37.) Accordingly, Rhoads has proffered insufficient evidence to support any possible theory for recovery of back pay after February of 1995. *Cf. Blackburn v. Martin,* 982 F.2d 125, 129 (4th Cir.1992) (back pay not recoverable in connection with a position abolished for financial reasons, or tied specifically to a contract or project which subsequently ended); *Gaddy v. Abex Corp.,* 884 F.2d 312, 319 (7th Cir.1989) (employer's back pay liability for the wrongful lay-off of an employee/plaintiff not severed when employer sold plant where plaintiff worked given evidence which revealed employees in plaintiff's former department continued to be employed in the same positions by the new plant owner after the sale); *Carter v. Shop Rite Foods,* 470 F.Supp. 1150, 1159–61 (N.D.Tex., 1979) (back pay terminates when employer sells and ceases to control division that formerly employed women wrongfully denied promotions).

### c. Liquidated Damages

Under the FMLA, at the discretion of this Court, liquidated damages may be proper. *See* 29 U.S.C. § 2617(a)(1)(A)(iii). The defendants argue that plaintiff is not entitled to such liquidated damages pursuant to 12 U.S.C. § 1825(b)(3) which provides that the FDIC "shall not be liable for any amounts in the nature of penalties or fines." In order to carry this point, the defendants must establish that the liquidated damages available under the FMLA are similar in nature to a penalty, and that 12 U.S.C. § 1825(b)(3) operates to bar the award of such damages against the FDIC.

To answer the threshold question of whether FMLA liquidated damages are penalties, this Court will review the analogous remedial provisions of the Fair Labor Standards Act, 29 U.S.C. § 216 ("FLSA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 626 ("ADEA"). The liquidated damages provided for in the FLSA are deemed compensatory and not a penalty. *See Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945) ("[t]he liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult in proof for estimate other than by liquidated damages."). In contrast, the Supreme Court has held the liquidated damages provided for in the ADEA are punitive. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 125–26, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) ("The legislative history of the ADEA indicates that Congress intended for liquidated damages to be punitive in nature."). After comparing the case law and legislative history available for the three statutes, this Court concludes that the liquidated damages provision of the FMLA operates in a manner most analogous to the liquidated damages provision of the FLSA, and therefore, should not be considered a penalty.

Although the wording of the FLSA and the FMLA liquidated damages provisions are not identical, they are substantially similar, particularly given the amendments to the FLSA contained in the Portal–to–Portal Act of 1947, 29 U.S.C. §§ 251–262. Under the FLSA, "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee ... in the amount of their unpaid ... compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216. This provision was amended by the Portal–to–Portal Act as provided,

> if an employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260. Similarly, under the FMLA,

> "[a]ny employer who violates section 2615 of this title shall be liable to any eligible employee affected—(A) for damages equal to—(I) the amount of—(I) any wages ... or other compensation denied or lost ...; and (iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (I) ... except that if an employer ... proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith...."

29 U.S.C. § 2617. Furthermore, the FLSA serves as a reference for many of the legal standards and principals used in the FMLA, including the enforcement scheme. *See Waters v. Baldwin County,* 936 F.Supp. 860, 863 (S.D.Ala.1996) (finding the definition and interpretation of the term "employer" is the same under the FMLA and the FLSA); *Rich v. Delta Air Lines, Inc.,* 921 F.Supp. 767, 772 (N.D.Ga.1996) (FMLA expressly directs courts to apply the principles for calculating "hours of service" as established under the FLSA to the FMLA context); *Morris v. VCW, Inc.,* 1996 WL 740544, *2 (W.D.Mo. 1996) (using the case law defining "good faith" for purposes of the FLSA liquidated damages provision to inform the standard for "good faith" under the FMLA's liquidated damages provision); S.Rep. No. 103, at 35 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 37 ("S.5's [the Senate version of the FMLA] enforcement scheme is modeled on the enforcement scheme of the FLSA...."). Indeed, the legislative history directly supports this close relationship. "The Family and Medical Leave Act ... accommodates the important societal interest in assisting families, by establishing a minimum labor standard for leave. The bill is based on the same principle as the ... minimum wage ... and other labor laws that establish minimum standards for employment." S.Rep. No. 103, at 4–5 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 6–7. Additionally, there is an important difference between the liquidated damages provision of the FMLA and the similar ADEA provision—the ADEA provision is appropriate only in cases of willful violations, which as defined by the Supreme Court requires a showing that the employer shows "reckless disregard" for determining whether its conduct violated the ADEA. *See* 29 U.S.C. § 625(b), *Thurston,* 469 U.S. at 125–26, 105 S.Ct. at 623–24 (finding the ADEA liquidated damages provision should be interpreted in accord with the legislative history which indicated it was adopted in place of a criminal provision borrowed from the FLSA). Whereas, employers under either the FMLA or the FLSA may assert the affirmative defense of good faith to avoid a liquidated damages award. *See* 29 U.S.C. § 2617(a)(*l* )(A)(iii); 29 U.S.C. § 260. *See also, Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 311 (7th Cir.1986) ("The *Thurston* standard does not apply to the doubling of damages under the FLSA ... because the FLSA does not use the word 'willful' and puts the burden on the defendant.")

Finally, the reasons behind the interpretation that the liquidated damages provision of the FLSA is not penal, translates fairly well to the context of the FMLA. The FLSA liquidated damages provision is considered compensatory, rather than penal both due to the obscure nature of assessing the damage of denying the minimum wage, and out of a "recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living ... that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well being." *Brooklyn Savings Bank,* 324 U.S. at 707, 65 S.Ct. at 902. Similarly, FMLA intends to provide a minimum standard of leave, which Congress has also found necessary for the general health and well being of workers and their families, and the value of which could be quite difficult to assess. The deterrent of double damages found in the FMLA operates like those of the FLSA—it prevents employers from gambling on their ability to evade providing coverage, and therefore, acts as insurance that employees will not be denied FMLA benefits. *Cf. Brooklyn Savings Bank,* 324 U.S. at 709, 65 S.Ct. at 903. In sum, though the answer to this question is by no means "clear as a bell"—double damages will always combine

some properties of compensation and penalty for those who receive and pay them—however, without further direction from the Fourth Circuit, this Court concludes considering the liquidated damages provision of the FMLA non-penal appears to be the wisest course in this case.

In light of this Court's conclusion that the liquidated damages provision of the FMLA is not a penalty, this Court need not determine whether 12 U.S.C. § 1825(b)(3) bars the award of liquidated damages in this case.

### VII. Conclusion

This Court grants in part and denies in part the defendants' motion for summary judgment. Defendants' motion for summary judgment with respect to Counts II, III, V to VII, and VIII to X of plaintiff's complaint is granted. Plaintiff's cross-motion for summary judgment is also denied. Defendants' motion for summary judgement with respect to Count I, plaintiff's alleged FMLA claim against the FDIC, is denied. Finally, the defendants' liability for back pay, should such an award be appropriate in the resolution of this suit, ceases after February 1995, when SFSA's assets were sold.

### ORDER

Defendants' summary judgment motion is hereby denied in part and granted in part. Plaintiff's partial summary judgment motion is hereby denied.