Kerry C. **CHIDEBE**

v.

**MCI TELECOMMUNICATIONS CORP.**

Civil No. CCB–96–3169.

United States District Court,
D. Maryland.

Jan. 26, 1998.

Edwin R. Burkhardt, Towson, MD, for plaintiff.

Emmett McGee, Jr., Piper and Marbury, Baltimore, MD; Harvey Rumeld, MCI Communications Corp., Washington, DC, for defendant.

## MEMORANDUM

BLAKE, District Judge.

Now pending is the motion for summary judgment filed by defendant MCI Telecommunications Corporation ("MCI") in this suit brought by former MCI employee, Kerry Chidebe, alleging violations of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 – 2654 (Supp. 1997), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 – 12213 (1995 & Supp.1997).[1] The motion has been fully briefed,[2] and no hearing is deemed necessary. See Local Rule 105.6. Ms. Chidebe, who claims a disability and need for medical leave based on stress, complains primarily of her May 1996 termination and also of an alleged failure to grant requested leave in February 1996. For the reasons that follow, the defendant's motion will be granted.

## BACKGROUND

Ms. Chidebe was hired in April 1994 as a Staff Assistant I, Compensation and Benefits Administrator, in the Human Resources ("HR") Department at MCI's Sales Center in Linthicum, Maryland. She reported to Karen Allen, the HR manager in Linthicum, who in turn reported to James Yates, a senior HR manager based in Atlanta. Mr. Yates interviewed Ms. Chidebe by telephone in April 1994 and approved the final decision to hire her. (Def.'s Mem. Supp. Summ. J. Ex. C., Yates Aff. ¶ 3,)

Mr. Yates expressed concerns regarding Ms. Chidebe's performance in an e-mail to Ms. Allen in November 1994.[3] Similar concerns were reflected in Ms. Allen's annual evaluation of Ms. Chidebe in April 1995, in which Ms. Chidebe received high marks for her substantive knowledge, but low marks in the areas of communication and planning. (Id. Ex. A, Chidebe Dep.Ex. 3). Ms. Allen believed that Ms. Chidebe had shown improvement, however, in her "unacceptable negative behavior," and urged her to strive for "consistent demeanor, consistent communication, consistent team-player, etc." in the future. Id.

In November 1995, Ms. Allen recommended to Mr. Yates that Ms. Chidebe be promoted to Staff Assistant II. According to Ms. Allen, while she still had reservations about Ms. Chidebe's performance, she be-

---

1. Ms. Chidebe's first amended complaint also refers to a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e – 2000e– 17 (1994 & Supp.1997), but that claim is not pressed in her opposition to the defendant's motion and could not survive in any event. Ms. Chidebe also has withdrawn her claim in Count I for discrimination in work assignments prior to February 1996.

2. The plaintiff's motion for leave to file a surreply was **Granted**, and MCI was given until January 15, 1998 to respond.

3. Mr. Yates stated in that message:
Karen, I appreciate everything you are trying to do with Kerry. As you know, I am very concerned about her and the way she reflects on BW [Baltimore–Washington] HR. I have a lot of tolerance for a lot of things. Two things I have little tolerance of are: Poor customer service for the client and poor teamwork.

As I said, I support whatever course of action you want to take. I also think that there is a great deal of risk with Kerry and have concerns as to whether we will be able to turn this around.

My only advise is that you not spend an extraordinary amount of time trying to change something that is not able to be changed.
Please keep me posted!!
(Def.'s Mem.Ex. B., Allen Aff. Tab 2.)

lieved promotion was appropriate for three reasons: Ms. Chidebe's workload had increased somewhat, she had been brought in at an entry-level salary that required an increase to make it more competitive with the salary of her peers, and her good substantive knowledge made her a potential asset to the department. (*Id.* Ex. B, Allen Aff. ¶ 7.) Mr. Yates eventually agreed because of Ms. Chidebe's knowledge and the need to make her salary higher. (*Id.* Ex. C, Yates Aff. ¶ 6.) Shortly after that, however, according to Ms. Allen, Ms. Chidebe's interpersonal behavior and ability to meet deadlines deteriorated rather than improved. (*Id.* Ex. B, Allen Aff. ¶ 8.) In particular, she embarrassed Mr. Yates by what he perceived as rude behavior during a national conference call with other HR teams. (*Id.* Ex. C, Yates Aff. ¶ 7.)

On February 13, 1996, Ms. Chidebe called Ms. Allen and told her she had suffered an anxiety attack, was being treated for stress, and needed to take two to three weeks off on the instructions of her physician. (*Id.* Ex. A, Chidebe Dep. at 86–88.) This was Ms. Chidebe's first request for a leave of absence and the first time she had advised Ms. Allen that she was suffering from stress. (*Id.* at 92, 101–02; Ex. B, Allen Aff. ¶ 9.) Ms. Allen granted the request and advised other staff members by e-mail on February 14, 1996 that:

> Team, Kerry will be out of the office for at least a week. According to her doctor, her current bout of athsma [sic] is induced by "severe stress".
>
> She offered to be working on "back-end" things from home, and I accepted her offer, as long as her doctor did not object.
>
> Might I suggest that if we call her, we do so collectively, perhaps once a day if we have questions about her area of responsibility.
>
> We can all relate to the ills of stress, but when it impacts our immediate health, we need to take heed.

(*Id.* Ex. B, Allen Aff. Tab 3).

The next day, after talking to Mr. Yates at the request of Ms. Chidebe, Ms. Allen approved Ms. Chidebe's request to be compensated for four hours of work at home per day, with the other four hours to he paid as sick leave. (*Id.* Tab 4).

Ms. Chidebe returned to full-time work after her two-week leave. While she now says her request for leave was not fully granted, and that she only asked to be paid for work at home when she "was called repeatedly at home" for a "few days" (Pl.'s Opp.Ex. 5, Chidebe Aff. ¶ 8), there is no contemporaneous evidence that she or any physician ever complained about the work-at-home arrangement, which enabled her to receive full compensation for the time she was out. At no time after she returned to work did she make any further request for accommodation. (Def.'s Mem.Ex. A, Chidebe Dep. at 112, 114).

In April 1996, when Ms. Chidebe was due for another annual performance review, Ms. Allen began drafting evaluations, initially providing that Ms. Chidebe would be put on a performance-action plan but later providing for termination, after discussions with Mr. Yates. At least one draft was shared with Ms. Chidebe, apparently with a performance action plan. It is not disputed that on April 18, 1996, Mr. Yates held personal meetings with staff members at the Linthicum Center, and in his meeting with Ms. Chidebe informed her that she was "the problem," and he was going "to fix the problem." (*Id.*, at 136–37; Ex. C, Yates Aff ¶ 7; Pl.'s Opp.Ex. 5, Chidebe Aff. ¶ 14.) According to Mr. Yates and Ms. Allen, Mr. Yates then met with Ms. Allen, rejected the option of a performance-action plan, and advised her that termination was the only option. (Def.'s Mem.Ex. B, Allen Aff. ¶ 11; Ex. C, Yates Aff. ¶ 7.). Ms. Allen met with Ms. Chidebe on April 23, 1996, told her of this decision, and said she would have 30 to 40 days to look for another job. Ms. Allen says she counted out the remaining days of Ms. Chidebe's employment and marked in her Day Planner the last possible week of Ms. Chidebe's employment. (*Id.* Ex B, Allen Aff. ¶ 12; Def.'s Reply to Surreply Ex. A., Allen Supp. Aff. ¶ 3 and attached copy of June 1996 Day Planner.) On May 1, 1996, in the course of preparing a job description to solicit applicants after Ms. Chidebe left, Ms. Allen sent an e-mail to Mr. Yates and two other manag-

ers asking for their comments. (Def.'s Mem. Ex. B, Allen Aff. Tab 5.)

In an affidavit submitted with her opposition, Ms. Chidebe denies she was told she would have to leave on a certain date, claiming that while she knew in April 1996 that her employment was "in jeopardy," she was never told she would be terminated. (Pl.'s Opp. Ex 5, Chidebe Aff. ¶ 16.) On May 6, 1996, however, Ms. Chidebe told her licensed clinical social worker that during her meeting with her supervisor in April she had been told she had 30 to 40 days to find a new job. (Def.'s Mem.Ex. D, Anderson Aff. ¶ 3.) Also, in an affidavit submitted to the EEOC in May 1996, Ms. Chidebe stated that she had been told in April that "I had about 30 days to find another job before I was terminated." (Id. Ex. A, Chidebe Dep.Ex. 14.)

On May 7, 1996, Ms. Chidebe told Ms. Allen that she needed a one month FMLA leave of absence for her stress and provided a letter from her doctor. (Pl.'s Opp.Ex. 10.) On May 10, 1996, believing she had evidence that Ms. Chidebe had taken unauthorized overtime, Ms. Allen wrote a letter terminating Ms. Chidebe immediately, rather than waiting for the rest of the 30 to 40 day period to expire. Ms. Chidebe now claims that the decision to terminate her was not made until she took leave on May 7, 1996, but the record evidence described above does not support that claim. Further, the letter written by Ms. Allen on May 10, 1996, refers explicitly to the 30 to 40 day time period:

> If you recall, you were given notice that your employment was in jeopardy. I informed you that you would be allowed 30 to 40 days to look for other employment. It has come to my attention that you falsified your timesheet (ETS) reflecting an unauthorized amount of overtime. Please be advised that your employment is terminated immediately.

(Pl.'s Opp.Ex. 12.)

### ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that:

> [Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

Moreover, the Supreme Court has explained that the Rule 56(c) standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The Court has stated that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *see also Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," *Shaw*, 13 F.3d at 798, but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "[A] defendant ... should not be required to un-

dergo the considerable expense of preparing for and participating in a trial" unless the plaintiff has produced evidence on which a jury might rely in support of the claims alleged. *E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.*, 678 F.Supp. 567, 573 (D.Md.1988).

██ In Counts III and VI of the amended complaint, Ms. Chidebe complains that MCI failed to accommodate her request for leave in February 1996 in violation of the ADA and the FMLA. This claim is not supported by the evidence, which shows that she received both the two-week leave and the work-at-home arrangement she requested, and she asked for nothing further after she returned. It was her responsibility to inform MCI if additional accommodation was needed. *See* 42 U.S.C.A. § 12112(b)(5)(A) (defining discrimination as "not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability" (emphasis supplied)); 29 C.F.R. § 1630.9 ("In general ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." (Appendix: Interpretive Guidance at 414)); *see also Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996) (affirming summary judgment for defendant where it "adjusted [plaintiff's] workload in accordance with its understanding of the disability. At no point did [plaintiff] tell [defendant] exactly what she needed."); *Rhoads v. F.D.I.C.*, 956 F.Supp. 1239, 1248–49 (D.Md.1997) (defendant "should not be held liable for an accommodation which it was never requested to make"). Nor has Ms. Chidebe shown any compensable violation of the FMLA. Even assuming there were paperwork errors in the processing of her request, she received all the FMLA benefits she was entitled to. *See Dodgens v. Kent Mfg. Co.*, 955 F.Supp. 560, 564–65 (D.S.C.1997) (granting summary judgment for defendant despite failure to explain FMLA benefits and leave rights to plaintiff, where plaintiff nevertheless received all the leave benefits to which he was entitled).

██ In Counts II, IV, V and VII, Ms. Chidebe complains that she was terminated in violation of the ADA and the FMLA and in retaliation for exercising her rights under those statutes. Her retaliation claims fail because she cannot show a causal connection between the decision to terminate her employment, which was made and communicated to her in April 1996, and her May 7, 1996 request to take a leave of absence for stress.[4] *See Beno v. United Tel. Co. of Fla.*, 969 F.Supp. 723, 726 (M.D.Fla.1997) (holding plaintiff failed to make out causation element of prima facie case where "steps toward termination were already underway before [plaintiff] requested leave"). In addition, Ms. Chidebe's February 1996 request for leave was fully accommodated, and the record shows that MCI employees at Linthicum have routinely been granted medical leaves of absence for which they were eligible, without adverse consequences. (Def.'s Mem.Ex. F, Stafford Aff. ¶ 4.) *Cf. Dodgens*, 955 F.Supp. at 566 (granting summary judgment where no evidence that employer's implementation of leave policy was rooted in discrimination). Similarly, her claim that the termination was motivated by an intention to discriminate against her because of ·her stress or her previous need for leave is unsupported. MCI has advanced a well-documented legitimate business reason for its April 1996 decision, and Ms. Chidebe has failed to show it was pretextual. *See Rhoads*, 956 F.Supp. at 1250 (granting summary judgment where plaintiff failed to show employer's claimed reason for dismissal, unexcused absenteeism, was pretextual). While Ms. Allen's belief that Ms. Chidebe had falsified her overtime, which led to immediate termination, may or may not have been accurate, there is no evidence that it

---

4. Ms. Chidebe's recent affidavit denying that she was told she would be terminated reflects adversely on her credibility and in any event is insufficient to create a genuine dispute of material fact in light of her earlier statements to the contrary. *See Halperin v. Abacus Tech. Corp.*,

128 F.3d 191, 198 (4th Cir.1997) (" 'A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.' *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984)." (alteration removed)).

was a pretext for discrimination.[5] Ms. Chidebe cites to *Thomlison v. City of Omaha*, 63 F.3d 786, 789 (8th Cir.1995), where the court found a "strong temporal connection [between the plaintiff's] medical condition and the sudden discovery of [her] alleged falsification" of medical exam forms over a year before. In *Thomlison* the decision to terminate the plaintiff was made after discovery of the alleged falsification; here, by contrast, the decision to terminate Ms. Chidebe was made in April, before the discovery of her alleged falsification of overtime, so no temporal connection exists at all, much less a "strong" one. In any event the discovery of the alleged falsification had only a small effect on Ms. Chidebe's length of employment with MCI. Ms. Chidebe also claims that Ms. Allen lied about posting an advertisement for her position in the Baltimore Sun, because a subpoena of the Sun's records showed no advertisement placed by MCI. (Pl.'s Opp.Ex. 14.) However, Ms. Allen's May 8, 1996 e-mail to Mr. Yates reporting that she told Ms. Chidebe she had placed a "blind" ad the previous weekend (Pl.'s Opp.Ex. 10), as well as her later affidavit stating that the Baltimore Sun ad "was placed by an advertising agency as a 'blind' ad and did not reference MCI" (Def.'s Reply to Surreply Ex. A, Allen Supp. Aff. ¶ 4), are both entirely consistent with the Baltimore Sun's failure to discover correspondence relating to an ad "run, purchased or ordered by an entity known as MCI ...." (Pl.'s Opp.Ex. 14.) But even if Ms. Allen's credibility were called into question regarding these events, no causal connection between the May 1996 advertisements and the April 1996 termination can be shown. Similarly, Ms. Chidebe's assertion that Ms. Allen lied about the exact date on which she posted Ms. Chidebe's job internally at MCI suffers from the same lack of a causal connection to the termination decision. Whether Ms. Allen had already posted the position internally when Ms. Chidebe announced on May 7, 1996 that she intended to take medical leave, *see* Pl.'s Opp.Ex. 10, or after May 10, 1996, the date her termination became effective, *see id.* Ex. 1, Allen Video

Dep. at 12:43 – 12:44 P.M., Ms. Chidebe's May 7, 1996 request for medical leave simply cannot have caused her April termination. And to the extent that Ms. Allen's statements may be inconsistent as to the posting date, any doubt cast on her credibility cannot overcome Ms. Chidebe's own admissions that she had been told in April she would be terminated in 30–40 days. (Def.'s Mem.Ex. D, Anderson Aff. ¶ 3; *id.* Ex. A, Chidebe Dep. Ex. 14.)

---

5. The Department of Labor investigation of this issue, (*See* Pl.'s Opp., Ex. 9) apparently concluded without an interview of Ms. Allen, is of little probative value and would not be admitted at trial. *See Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988).