Bernard O. CARLSON, Plaintiff

v.

RENT–A–CENTER, INC. Defendant

No. Civ. 02–128–PH.

United States District Court,
D. Maine.

Jan. 14, 2003.

Bernard O. Carlson, Biddeford, ME, plaintiff, pro se.

James R. Erwin, Pierce, Atwood, Portland, ME, for Rent A Center Inc, defendant.

**ORDER AFFIRMING RECOM-
MENDED DECISION OF THE
MAGISTRATE JUDGE**

HORNBY, District Judge.

The United States Magistrate Judge filed with the court on December 20, 2002, with copies to the parties, her Recommended Decision on Defendant's Motion for Summary Judgment. The time within which to file objections expired on January 10, 2003, and no objections have been filed.

The Magistrate Judge notified the parties that failure to object would waive their right to *de novo* review and appeal.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. Summary Judgment is GRANTED to the defendant on the plaintiff's claims under the Americans with Disabilities Act and the Maine Human Rights Act. With regard to the plaintiff's denial of leave claims, judgment is GRANTED to the defendant on the plaintiff's Maine Family and Medical Leave Act claim; summary judgment is DENIED to the defendant on the plaintiff's federal Family and Medical Leave Act claim. So ORDERED.

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KRAVCHUK, United States Magistrate Judge.

Bernard Carlson, proceeding *pro se*, is suing his former employer, Rent–A–Center, for violations of his rights under the Americans with Disabilities Act, the Maine Human Rights Act, the federal Family and Medical Leave Act, and the Maine Family Medical Leave Act. (Dockets No. 1 & 16.) Carlson is a diabetic who was denied a request for medical leave and was fired by Rent–A–Center in the fall of 2000. Rent–A–Center has filed a motion for summary judgment (Docket No. 8) and Carlson has responded (Docket No. 17). For the reasons herein discussed, I recommend that the Court GRANT the defendant's motion with respect to Carlson's disability discrimination claims, and his claim under the Maine Family Medical Leave Act. However, I recommend that the Court DENY the motion with respect to Carlson's claim under the federal Family and Medical Leave Act.

### *Summary Judgment Standard and Record*

Rent–A–Center is entitled to summary judgment only if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact," Fed R. Civ. P. 56(c), and that Rent–A–Center "is entitled to a judgment as a matter of law," *id.* Though Rent–A–Center's "task is daunting," Carlson also faces a meaningful assignment: he "has a threshold burden to 'set forth specific facts showing that there is a genuine issue for trial.'" *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.*, 884 F.2d 1510, 1512 (1st Cir.1989) (quoting Federal Rule of Civil Procedure 56(e)).

Carlson's effort in responding to Rent–A–Center's motion does not pass muster. Carlson's response has a factual summary with no record citations. This pleading does not comply with the District of Maine Local Rule of Civil Procedure 56 as he has not submitted "a separate, short, and concise statement of material facts." D. Me. Loc. R. Civ. P. 56(c).[1] As a result, the facts contained in Rent–A–Center's supporting statement of material facts are deemed admitted, but only to the extent Rent–a–Center's record citations support

---

1. The local rule provides:
   (c) Opposing Statement of Material Facts
   A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.
   D. Me. Loc. R. Civ. P. 56(c).

the stated facts. D. Me. Loc. R. Civ. P. 56(e).[2] I also note that with respect to his arguments and the unsupported facts, Carlson has focused on responding to Rent–A–Center's arguments regarding his leave-related claim; he has set forth no argument to contravene Rent–A–Center vis-à-vis the disability discrimination claims. (Pl.'s Resp. at 1–6 & Exs. A–D.)[3]

Though summary judgment is difficult to navigate as a *pro se* plaintiff the pleading burden of the federal and local rules of civil procedure apply to represented and unrepresented parties alike. *Parkinson v. Goord*, 116 F.Supp.2d 390, 393 (W.D.N.Y. 2000) ("[P]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."). That Carlson envisions providing the court with medical records and other written documents sometime in the future (Def's Resp. Summ. J. at 1) does not arrest the summary judgment gauntlet. *See Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990) ("A genuine issue of material

fact does not spring into being simply because a litigant claims that one exists. Neither wishful thinking nor mere promises to produce admissible evidence at trial, nor conclusory responses unsupported by evidence, will serve to defeat a properly focused Rule 56 motion," internal citation and quotation omitted). To excuse Carlson's default with respect to record support for his factual assertions would, in effect, strip Rent–A–Center of its ability to move for a summary disposition of this action.

That said, I can grant Rent–A–Center's motion only if, on the record before me, they are entitled to judgment as a matter of law. *See Winters v. FDIC*, 812 F.Supp. 1, 2 (D.Me.1992) ("It is well-established law in this district that Fed.R.Civ.P. 56 requires the Court to examine the merits of a motion for summary judgment even though a nonmoving party fails to object as required by [the] Local Rule[s].").  I address the material facts properly before me.

### Material Facts

In accordance with the discussion above, I identify the following facts as material to

---

2. On this score the Local Rule provides:

   > (e) Statement of Facts Deemed Admitted Unless Properly Controverted; Specific Record of Citations Required
   > Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

   D. Me. Loc. R. Civ. P. 56(c),(e).

3. Carlson does mention discrimination in that he claims that an employee at the Biddeford Rent–A–Center store, Denise Desjardin, was given maternity leave on August 1, 2000, by Rent–A–Center, and was told that she would have 12 weeks to return to work. (*Id.* at 4 & Ex. D.) Carlson complains that he was discriminated against because he was out on leave for seven weeks "with a major medical problem" and was denied his request for five more weeks. (*Id.* at 4.) The exhibit that Carlson proffers with respect to his assertion is a typewritten statement of October 6, 2002, that has a signature line with "Denise Desjardins" in roman font and "Denise Desjardins" in italic font directly below (something similar in appearance to, *Denise Desjardin* ). Even if I were able to excuse Carlson's failure to present this factual assertion in conformity with the rules I could not assign evidentiary weight to this document.

Carlson's state and federal law disability and leave claims.

### A. The Wilson Enterprises to Rent–A–Center Sale and its Aftermath

On October 4, 1996, Carlson was hired by an entity named Wilson Enterprises (Carlson Dep. at 46), a Rent–A–Center franchisee that operated multiple Rent–a–Center stores in Maine. His job responsibilities included sales, customer service, and merchandising tasks (*Id.* at 46) at a store in Sanford, Maine. In October 1999 Carlson was transferred to the accounts department and became an account representative responsible for calling delinquent customers and collecting late payments. (*Id.* at 52.) Carlson negotiated this change with his supervisor because he was experiencing difficulty with his legs and, as an account representative, Carlson would spend approximately an hour a day on his feet, in contrast to the seven-hour stints required in his former position. (*Id.* at

54–55.) In his position as account representative Carlson would assist with other in-store responsibilities as needed. (*Id.* at 52.)

On June 27, 2000, Wilson Enterprises sold the assets of the Rent–A–Center franchise to Rent–A–Center (Colizzi Decl. ¶ 4) [4] and on that day Carlson understood that he was no longer employed by Wilson Enterprises (Erwin Decl. Ex B at 2; *id.* Ex. A at 2). He became an account manager for Rent–A–Center. (Erwin Decl. Ex B at 2; *id.* Ex. A at 2.)

Carlson reports that Rent–A–Center commenced some reorganization of the employees five weeks after the sale; at this juncture two driver employees were fired and two present employees who "knew the territory" were put in charge of pick-up and delivery. (Carlson Dep. at 69–72, 81.) This decreased the number of employees at the Sanford store from nine to seven. (*Id.* at 72.) At this time, in

---

4. Rent–A–Center states: "As with any asset purchase, Rent–A–Center did not assume responsibility for any of Wilson Enterprises' liabilities." (DSMF ¶ 6.) Its support for this legal characterization of the transaction is the declaration of David Colizzi. Colizzi was employed as the director of operations for Wilson Enterprises at the time of the June 27, 2000, purchase, he learned of the sale the day before, and participated in the conference call between the Rent–a–Center Vice President and all the managers of Wilson Enterprises. (Colizzi Decl. ¶¶ 1–4.) Rent–A–Center's statement relies on two Colizzi averments. One, that the managers were not affirmatively told that their Wilson Enterprises benefits would be continued, and that, in fact, the health and retirement plans offered by Rent–A–Center were "substantially different" from those offered by Wilson Enterprises. (*Id.* ¶ 6.) Two:

> The years of service that the employees accumulated while working for Wilson Enterprises were not carried over when they were hired by Defendant. The new employees of Defendant were required to complete a year of service before becoming eligible

for vacation benefits. There was, however, some confusion over this issue. During an early conversation with Vice President Tony Doll, managers were told that any employee who had accrued vacation time with Wilson Enterprises of Maine[] would still be entitled to take that vacation time with pay with Rent–A–Center, even though any Wilson Enterprises [e]mployee who was owed vacation pay at the time of the sale received all such pay from Mr. George Wilson. Mr. Doll later reversed this decision and all employees were notified of the change, although they were not happy with the decision.

(*Id.* ¶ 7.)

This record does not support a determination that the Rent–A–Center purchase was simply "an asset purchase" nor does it support a conclusion that there were no agreements outside of Colizzi's ken about, say, liabilities or employee retention and benefits. The Colizzi declaration is a thin reed indeed on which to hang many of Rent–A–Center's efforts to characterize the legal contours of the Wilson Enterprises/Rent–A–Center transaction.

early August 2000, a representative of Rent–A–Center came and announced that "they were new hire of Rent–A–Center." (*Id.* at 87–88.) Rent–A–Center explained that all store employees would have to do all tasks, inside and outside (*id.* at 88) and Carlson understood this to be a Rent–A–Center policy (*id.* at 126). Carlson also understood that Rent–A–Center wanted him, as a collection department employee, to do both delivery and pick-up (repossession) of merchandise. (*Id.* at 124.)

In support of its contention that its employees were each required to do a wide range of in and outside tasks Rent–A–Center cites to its Account Manager's Compensation Plan. Effective September 11, 1999, it contains a section describing the positions "ESSENTIAL JOB FUNCTIONS":

> Answer phone calls in a professional manner, take orders, deliver and pick-up merchandise, review past due accounts, and call customers with past due accounts. Clean vehicles and make sure that the vehicle is being properly maintained. Clean showroom, restroom, work areas, and merchandise. Make the merchandise available for rent as returned from the customer's home. Prospect for new business through various means including telemarketing and distributing brochures and flyers.

(Erwin Decl. Ex. F to Ex. B.) Carlson understood that as an account manager under Rent–A–Center he would be responsible for doing pick up and deliveries. (Carlson Dep. at 76.)

With respect to benefits, Carlson understood after these August 2000 changes that he lost his vacation time accrued prior to June 27, 2000. (*Id.* at 89.) Carlson's hours were cut from forty-five hours to forty hours and he received a raise from $8.50 an hour to $13.00 an hour. (*Id.* at 88.) Colizzi, the former director of operations who started with Wilson Enterprises, perceived the benefits—such as the health and retirement plans—offered by Rent–A–Center to be "substantially different" from those offered by Wilson Enterprises. (Colizzi Decl. ¶ 6.) [5] Carlson did not have any retirement accrued under Wilson Enterprises but he perceived that some of his co-workers were able to cash out their Wilson plan and "start all over again." (Carlson Dep. at 90.) [6] Additionally, with respect to health benefits, the employees' insurance company changed and Carlson's co-payment went up. (*Id.* at 91.) When the Rent–A–Center purchase was "complete" Carlson received an employee handbook from Rent–A–Center. (*Id.* at 172.) [7]

Colizzi recalls that Rent–A–Center informed Wilson Enterprises managers on June 27, 2000, that all Wilson Enterprises employees would be considered for hire by Rent–A–Center based on standard Rent–A–Center hiring practices. (Colizzi Decl. ¶ 5.) While only two people were fired from his store in Sanford, Carlson believes of the fourteen other stores formerly owned by Wilson Enterprises a number of Wilson Enterprises employees were terminated by Rent–A–Center. (Carlson Dep. at 176–78.) Carlson understood that these terminations included both management

---

**5.** Rent–A–Center also references Colizzi's interpretations of the changes in benefits; these are rendered in footnote 3, *supra,* for what they are worth.

**6.** This is one instance among many in which Rent–A–Center's statement of fact is more general and sweeping than this (DSMF ¶ 13)

but the record only supports a much narrower or particular assertion.

**7.** Rent–A–Center describes this as "a comprehensive handbook describing its workplace policies and the benefits offered to employees," (DSMF ¶ 14) but have not adequately supported this characterization.

and non-management personnel. (*Id.* at 177.) In September 2000, Carlson believes, Rent–A–Center hired an outside individual, Terry Powers, to manage the store where Carlson worked, displacing the manager that had served in this position prior to the sale. (Carlson Dep. at 62.)

### B. Carlson's Medical Condition

Carlson claims that he is disabled because he has reduced circulation in his leg (Carlson Dep. at 142–43.) This problem is caused by four blocked arteries attributable to diabetes, first diagnosed in October 1999 by Carlson's physician, Doctor Kowash. (*Id.* at 26–27, 142–43.) Carlson believes that his diabetes is well controlled by the medications he takes, medications which do not include insulin. (*Id.* at 29–31.) The first symptom that Carlson suffered from his diabetes was the August 2000 onset of gangrene in his feet. (*Id.* at 32.) The only other similar problem Carlson had after this was in April 2001, when a blister on his foot ulcerated as result of improper bandaging, and this was a problem that healed faster than his August 2000 infection. (*Id.* at 39–42, 44.) Carlson had no physical limitations or restrictions as a consequence of the April 2001 infection; he was able to walk, stand, lift, and drive. (*Id.* at 45.) With respect to the prospect of further infections, Carlson believes that this would only happen if he was cut or suffered another blister, or something of that kind. (*Id.* at 44.) Carlson's doctor has not told Carlson to expect other symptoms from his diabetes. (*Id.* at 44–45.) Other than the risk of infection in his feet due to injury, the only other limitation on Carlson resulting from his diabetic condition is his inability to walk more than a mile on a "good day" and a half a mile on a "bad day." (*Id.* at 33–34.) The problems walking are ameliorated by sitting and resting. (*Id.* at 34.) As of Octo-

ber 7, 2002, Carlson believed that he was able to perform the essential functions of the account manager position as defined by Rent–A–Center. (*Id.* at 92.)

### C. Leave of Absence and FMLA Request

Carlson went on leave from Rent–A–Center on August 23, 2000, when his feet became infected with gangrene. (*Id.* at 92; Erwin Decl. Ex.A to Ex. B.) On August 30, 2000, Carlson requested leave for the period between August 23 and October 16, 2000, under the Family and Medical Leave Act (FMLA). (Carlson Dep. at 93; Erwin Decl. Ex.A to Ex. B.) At some point thereafter (probably on September 22, 2000), Rent–A–Center notified Carlson that he was ineligible for leave under the FMLA because Carlson had not worked for Rent–A–Center for the required twelve months. (Carlson Dep. at 98 99; *see also* Erwin Decl. Ex. A to Ex. B.) Carlson was allowed to be out of work for seven weeks without pay, but not as an entitlement under the FMLA. (Carlson Dep. at 107.)

Carlson returned to work on October 14, 2000. (*Id.* at 100.) On this day Carlson initiated a discussion with his manager, Terry Powers, after being asked to do a pick-up. (Carlson Dep. at 106.) Carlson said to Powers, "if I had actually known that—what had changed, that I wouldn't even be back to work yet and that perhaps I should just go back on medical leave." (*Id.*) Powers told Carlson that he did not have any medical leave and that if he could not perform the job Rent–A–Center would have to "get rid" of Carlson. (*Id.*) Carlson viewed this exchange as a request for additional leave but did not fill out any form seeking additional leave. (*Id.* at 108.)

Carlson obtained a note dated October 31, 2000, from Dr. Kowash advising that Carlson should be "on light duty indefinite-

ly" and indicating that he should not be on his feet more than fifteen minutes at a time, should not engage in lifting objects over ten pounds, and should not partake in outdoor work. (*Id.* at 102–03; Erwin Decl. Ex. D to Ex. B.) On November 4, 2000, Carlson delivered this note to Powers because he was concerned that if he continued with all his responsibilities his feet would never heal. (*Id.* at 115–16.) In light of the doctor's restrictions Carlson could not perform all the duties of the account manager job as defined by Rent–A–Center. (*Id.* at 127, 141.) It was Carlson's understanding that Rent–A–Center did not have "light duty" jobs. (*Id.* at 127.) Rent–A–Center also points to a January 19, 1999, memorandum to Rent–A–Center store managers that directs managers to inform new-hires that its stores have no "light-duty" positions available. (Erwin Decl. Ex. B. ¶¶ 21–22; *id.* Ex. E to Ex. B.) This memo further indicates:

> If an employee's physician determines the employee is unable for some period of time to perform the full range of duties required in his/her applicable position description, the employee will be placed on leave without pay, except as otherwise provided for under applicable state disability or workers compensation programs.

(Erwin Decl. Ex. E to Ex. B.)

Carlson was terminated on November 4, 2000, Powers having told him that he was being terminated because he could not do the job and Carlson understanding that at that time he could not perform the essential functions of the account manager position as the job was defined by Rent–A–Center. (*Id.* at 141.) At the time of this termination neither Carlson nor his doctor articulated to Powers when Carlson would be able to return to work to resume all his job responsibilities. (*Id.* at 127–28.) Carlson claims that by the end of November

2000 his feet had heeled enough for him to perform the essential functions of the account manager position and that his restrictions had been lifted. (*Id.* 35–36, 39.) Carlson recalls that his doctor lifted the restrictions at the end of November but does not believe that there are medical records or written notes to this effect. (*Id.* at 36.) When Carlson felt that he was able to do the work Powers required of him he did not contact Rent–A–Center to notify it that this was the case. (*Id.* at 180.)

### Discussion

### A. Carlson's Disability Discrimination Claims

Carlson's disability discrimination claims are brought under both the Americans with Disability Act (ADA), 42 U.S.C. § 12101, et seq., and the Maine Human Rights Act (MHRA), 5 M.R.S.A. 4551, et seq. "Interpretation of the ADA and of the Maine Human Rights Act [has] proceeded hand in hand," and so I key my discussion to the ADA, "which has provided guidance to Maine courts in interpreting the state statute." *Soileau v. Guilford of Me., Inc.,* 105 F.3d 12, 14 (1st Cir.1997) (citing *Winston v. Me. Technical Coll. Sys.,* 631 A.2d 70, 74–75 (Me.1993)); *Winston v. Me. Technical Coll. Sys.,* 631 A.2d 70, 74–75 (Me.1993) ("We have stated that because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA.").

To establish a claim of disability discrimination under the ADA, Carlson must show: (1) that he has a "disability" within the meaning of the ADA; (2) that he was able to perform the essential functions of his Rent–A–Center position, either with or without reasonable accommodation; and (3) that Rent–A–Center discharged him in whole or in part because of that disability.

*Lebron–Torres v. Whitehall Labs.* 251 F.3d 236, 239 (1st Cir.2001).

### 1. The Three Veins of ADA Disability

■ Carlson's claim fails on the first prong of his prima facie showing. The ADA defines the term "disability" as having three discreet veins (A) "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

### a. Physical Impairment that Substantially Limits Carlson's Walking

The facts material to Carlson's § 12102(A) showing of "a physical or mental impairment that substantially limits one or more of the major life activities" are that on a good day he can walk only a mile and on a bad day he can walk a half a mile. Sitting and resting ameliorate the strain from walking. This is the only limitation identified by Carlson due to his diabetes triggered blocked leg arteries. Carlson states that otherwise his diabetic symptoms are completely controlled by his medications. The record also indicates that Carlson experienced one bout of gangrene on his feet and one blister infection incident.

With respect to the 42 U.S.C. § 12102(2)(A) showing of an impairment I take the analysis in three steps:

> First, [I] consider whether [Carlson's condition] was a physical impairment. Second, [I] identify the life activity upon which [Carlson] relies ... and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, [I] ask whether the impairment substantially limited the major life activity.

*Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

Rent–A–Center concedes the first two steps of this inquiry to Carlson. It seems to allow that Carlson's non-insulin-dependant diabetes triggered leg circulatory problem is a physical impairment, a conclusion somewhat supported by one court's determination when addressing a more severe diabetic condition. *See Lawson v. CSX Transp., Inc.,* 245 F.3d 916, 923 (7th Cir.2001) (having "no difficulty" concluding that the plaintiff's particular case of insulin-dependant diabetes was an impairment, noting that it affects "many of the organ systems in his body, including his 'metabolic, vascular, urinary, and reproductive systems as well as his joints and eyes,' and negatively impacts his depression and high blood pressure.") Rent–A–Center acknowledges that walking is considered a "major life activity." 29 C.F.R. 1630.2(i) ("Major Life Activities means functions such as ... walking."); *see e.g., PGA Tour, Inc. v. Martin,* 532 U.S. 661, 668, 670, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (observing the uncontested proposition that a disease preventing walking qualified as an ADA disability); *accord Lyons v. La. Pacific Corp.,* 217 F.Supp.2d 171, 177 (D.Me.2002) (Kravchuk, Magis.J.). However, Rent–A–Center does contest that Carlson can "show that the limitation on the major life activity is 'substantia[l].' " *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. at 194, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002) (quoting 42 U.S.C. § 12102(2)(A)).

The United States Supreme Court explored the definition of "substantially limited" last term. Tracking the language of the definitional regulation, it stated:

> The [Equal Employment Opportunity Commission (EEOC) ] ... has created its own definition for purposes of the ADA. According to the EEOC regula-

tions, "substantially limit[ed]" means "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 CFR § 1630.2(j)(2001). In determining whether an individual is substantially limited in a major life activity, the regulations instruct that the following factors should be considered: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." §§ 1630.2(j)(2)(i)-(iii).

*Toyota Motor Mfg., Ky., Inc.,* 122 S.Ct. at 690.

The material facts bear out that Carlson's walking impairment is not severe, when measured against the walking abilities of the average person in the general population. *See Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 960 (8th Cir.2000) (plaintiff who can walk and has walked long distances, including approximately a mile to work, was not substantially impaired, even though she was limited in other activities also); *Kelly v. Drexel Univ.,* 94 F.3d 102, 105–08 (3d. Cir.1996) (careful survey of cases addressing walking limitations, observing the difficulty of drawing "a bright line delineating the point at which a condition affecting an employee's ability to walk can be regarded as a disability within the ADA," concluding that the plaintiff's difficulty walking over a mile and need to take stairs slowly due to a hip injury amounted to an impairment but not a substantial one within the meaning of the ADA); *Lyons,*

217 F.Supp.2d at 177–78 (concluding that the ADA plaintiff who professed an inability to hike Maine's tallest mountain did not meet the "substantially limited" requirement). Aside from the walking difficulty, Carlson has also experienced gangrene and infected blisters. However, Carlson does not view these incidents as severe or enduring. He states he is now able to perform all the work required by Rent–A–Center and that he does not anticipate further, more extensive medical problems than those encountered in the two incidents in the fall of 2000 and the spring of 2001. *See Toyota Motor Mfg., Ky., Inc.,* 122 S.Ct. at 691 ("The impairment's impact must also be permanent or long term."). I conclude that, taking all inferences in his favor, Carlson's impairment does not qualify under 42 U.S.C. § 12102(2)(A).

### b. Record of Carlson's Walking Impairment

Carlson does not articulate a "record of impairment" styled claim ala 42 U.S.C. § 12102(2)(B). Nor does the record properly before me, drawing all reasonable inferences in Carlson's favor, come near to supporting such a claim. The regulation defines "a record of such impairment" to mean "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(K). "[R]egarded as having such an impairment means:"

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2.(K).

In his response to Rent–A–Center's motion Carlson states that: "The Defendant fired the Plaintiff on November 4th, 2000 after reviewing a Doctor's note which was given by the Plaintiff to the Defendant's Store Manager. Rather than considering that the Plaintiff had a Disability and trying to work with the Plaintiff the Defendant viewed the Plaintiff as a company liability." (Pl.'s Resp. Mot. Summ. J. at 5.) Rent–A–Center's facts for the most part align with Carlson's assertion on this score. According to Rent–A–Center, Carlson was terminated on November 4, 2000, because he could not do the job and Carlson understood that at that time he could not perform the essential functions of the account manager position as the job was defined by Rent–A–Center. At the time of this termination neither Carlson nor his doctor articulated to Powers when Carlson would be able to return to work to resume all his job responsibilities.

Quite simply, Carlson has not controverted Rent–A–Center's demonstration that there is an absence of evidence that there was a "record" or misclassification within the meaning of 42 U.S.C. § 12102(2)(B). Carlson has not generated a disputed fact to the effect that Rent–A–Center had a record of or perceived him to have an entirely different impairment than the walking impediments caused by the artery blockage in his legs. *Santiago Clemente v. Executive Airlines, Inc.,* 213 F.3d 25, 33 (1st Cir.2000) (rejecting subsection (B) argument, observing that the plaintiff "point[ed] to no evidence of either a history or misdiagnosis of such an impairment").

### c. Regarding Carlson as Having a Walking Impairment

In an echo of the discussion above, with Carlson contending that Rent–A–Center refused to regard him as disabled, Carlson can take no shelter from 42 U.S.C. § 12102(2)(C). The "regarded as" prong of 42 U.S.C. § 12102(2)(C) has also been elucidated by a regulation which provides that an individual is "regarded as having such an impairment" when he or she:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2.

There is no factual basis for me to conclude that there is a genuine dispute as to whether Rent–A–Center regarded Carlson as substantially limited in a major life activity. There is record support for the conclusion that Rent–A–Center refused to grant him further medical leave in the face of Carlson's complaint that he could not undertake all of the required job duties until he was fully recuperated from his gangrene. However, as I have previously stated, the fact that the employer is aware of health limitations does not mean that it thought the plaintiff to be substantially impaired. *Lyons,* 217 F.Supp.2d at 180.

Because I conclude that there is no genuine dispute of material fact that Carlson was not disabled within the meaning of the ADA, I need not reach the question of

whether Carlson was able to perform the essential functions of his Rent–A–Center position, either with or without reasonable accommodation, nor need I inquire into whether Rent–A–Center discharged him in whole or in part because of that disability. *See Lebron–Torres*, 251 F.3d at 239. This conclusion holds true for Carlson's claims under the MHRA as well as his claims under the ADA.

### B. Carlson Denial of Medical Leave Claims

Carlson brings his denial of medical leave claim under the federal Family and Medical Leave Act (FMLA), 29 U.S.C. § 2611, and the Maine Family and Medical Leave Act (MFMLA), 26 M.R.S.A. § 843.

### 1. Maine Family and Medical Leave Act

■ Carlson's claim under the MFMLA is easily dispatched. The act reads:

**Family medical leave entitlement.** Every employee who has been employed by the same employer for 12 consecutive months is entitled to up to 10 consecutive work weeks of family medical leave in any 2 years unless employed at a permanent work site with fewer than 15 employees. The following conditions apply to family medical leave granted under this subchapter[.]

26 M.R.S.A. § 844(1). Carlson testified at his deposition that in August 2000 Rent–A–Center decreased the number of employees at the Sanford store where he worked from nine to seven. (Carlson Dep. at 72.) This is a fact properly before me and uncontroverted. (DSMF ¶ 17.) Carlson has no cause of action under the MFMLA.

### 2. Federal Family and Medical Leave Act

■ The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period" in the event "of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2602(A)(1)(D).[8] The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the [FMLA]." 29 U.S.C. § 2615(a)(1). The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by the [FMLA]." *Id.* § 2615(a)(2).

Under the statute Carlson is an eligible employee if he was employed "for at least 12 months by the employer with respect to whom leave is requested" under the FMLA and "for at least 1,250 hours of

---

**8.** Because Rent–A–Center has challenged only one aspect of Carlson's FMLA claim I need not address whether Carlson could meet the 29 U.S.C. § 2602(A)(1)(D) burden. Regarding this concern I note that my conclusion vis-à-vis his ADA claim is not determinative, as the FMLA regulations make clear:

If an employee is a qualified individual with a disability within the meaning of the Americans with Disabilities Act (ADA), the employer must make reasonable accommodations, etc., barring undue hardship, in accordance with the ADA. At the same time, the employer must afford an employee his or her FMLA rights. ADA's "disability" and FMLA's "serious health condition" are different concepts, and must be analyzed separately.

29 C.F.R. § 825.702(b). I also do not address other concerns that may be lurking vis-à-vis this claim. *See, e.g., Brunelle v. Cyro Indus., Inc.*, 234 F.Supp.2d 26, 27 (D.Me. 2002) ("If an employee is terminated for a legitimate, non-discriminatory reason ... he is only entitled to recover damages for an employer's FMLA violation suffered prior to his discharge.")

service with such employer during the previous 12–month period." 29 U.S.C. § 2612(2)(A)(i),(ii). "The term 'eligible employee' does not include," an "employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B).

Carlson has devoted a section of his responsive pleading to this § 2611(2)(B) concern. (Pl.'s Resp. Mot. Summ. J. at 2–3.) However, there being no record support for his list of addresses for sixteen Rent–A–Centers within seventy-five miles of the Sanford store there is no material fact that I can countenance here. However, because Rent–A–Center has set forth no fact material to this determination I cannot grant them summary judgment on the basis that Carlson was not an eligible employee within the purview of § 2611(2)(B). In any event Rent–A–Center has not moved for summary judgment on this basis.

Rent–A–Center's affront on Carlson's FMLA claim pivots on a determination of whether Rent–A–Center is a successor in interest to Wilson Enterprises. It argues that it is not. Rent–A–Center seeks judgment on the grounds that, as a summer 2000 new hire to Rent–A–Center, Carlson had not crossed the twelve-month threshold for being in its employ that would entitle him to leave under 29 U.S.C. § 2602(A)(1) of the FMLA. However, the FMLA provides that the term "employer" includes "any successor in interest of an employer." 29 U.S.C. § 2611(a)(4)(A)(ii)(II). If Rent–A–Center is a successor to Wilson Enterprises under this subsection then Carlson's entitlement

to FMLA leave would have been the same as if his employment by Wilson Enterprises and Rent–A–Center was "continuous employment by a single employer." 29 C.F.R. § 825.107(c). Rent–A–Center would be required to count Carlson's Wilson Enterprises periods of employment and hours worked for purposes of determining Carlson's FMLA leave eligibility. *Id.*

"What is meant by 'successor in interest'?" 29 C.F.R. § 825.107 (regulation title). The Department of Labor has provided a blue-print for answering this question.[9] The factors delineated are:

(1) Substantial continuity of the same business operations;

(2) Use of the same plant;

(3) Continuity of the work force;

(4) Similarity of jobs and working conditions;

(5) Similarity of supervisory personnel;

(6) Similarity in machinery, equipment, and production methods;

(7) Similarity of products or services; and

(8) The ability of the predecessor to provide relief.

29 C.F.R. § 825.107(a). (emphasis added). This blueprint is offered with the proviso that the "determination of whether or not a 'successor in interest' exists is not determined by the application of any single criterion, *but rather the entire circumstances are to be viewed in their totality.*" *Id.* § 825.107(b) (emphasis added).

Though professing to follow the "totality of circumstances" directive of the regulation, Rent–A–Center has focused on certain facets of its operations. The forefront factor cited to by Rent–A–Center pertain-

---

9. Although these regulatory factors may not be binding on the court, *see Vanderhoof v. Life Extension Inst.,* 988 F.Supp. 507, 512 (D.N.J. 1997), they are regulatory-level guidance and Rent–A–Center itself has recommended them.

ing to its actions upon buying Wilson Enterprises in not a factor that is directly highlighted by § 825.107. Rent–A–Center argues that when it purchased Wilson Enterprises "it assumed absolutely no responsibility for the liabilities of Wilson Enterprises" and that as a consequence it was Rent–A–Center's policy "to not recognize the years of service employees had with Wilson Enterprises for purposes of vacation and benefit eligibility." (Def.'s Mot. Summ. J. at 13.) Not only is there no credible record support for this assertion beyond the impressions of a Wilson Enterprises employee only peripherally privy to the sale transaction and Carlson's own unsophisticated understanding of the situation, (see DSMF ¶¶ 5–6,9), this issue of liability assumption is not referenced in § 825.107(a). Furthermore, it is not at all clear how Rent–A–Center's policy concerning the recognition of service for purposes of vacation and benefit eligibility is relevant to its obligation to act in conformity with the statutory mandate of the FMLA. Certainly, federal statutory mandates such as the FMLA are not a "liability" that is assumed or not assumed in a sales transaction.

Playing a similar tune, Rent–A–Center asserts that it "instituted new, and considerably different benefit packages and workplace policies, changed employee work hours, and gave substantial raises." (Id. at 11–12, 14.) While there is sufficient support to accept, after five weeks of status-quo, Rent–A–Center changed employee hours, gave raises to some, may or may not have led employees to believe that they lost pre-sale vacation time, and had a new medical provider, these are not wholesale changes in working conditions. I do not find sufficient support for the determination that it "instituted new, and consider-

ably different benefit packages and workplace policies." (See footnote 7, supra.)

With respect to the continuity of the work force, the similarity of jobs, and the similarity of supervisory personnel, Rent–A–Center asserts that it did not simply continue with the Wilson Enterprises work force "but instead hired and terminated employees according to its hiring practices, including both managerial and non-managerial employees," an approach that involved hiring a new manager for the Sanford store in September 2000. (DSMF ¶ 15,16.) Again its record support of this assertion is the declaration by Colizzi and the deposition testimony of Carlson, evidence which really only supports an assertion that two employees in the Sanford store were terminated a full five weeks after the sale and a new manager was hired in September. Rent–A–Center also states that the "jobs and working conditions significantly changed after the asset purchase," and that it reorganized the operations by eliminating a number of positions, implementing new job titles, and redefining job duties and responsibilities (DSMF ¶¶ 8, 19–20), solely relying on Carlson's deposition testimony and its 1999 "Account Manager's Compensation Plan" with its definition of essential job functions. It is undisputed that Carlson was required to assume additional responsibilities five weeks after the sale when he became an account manager as defined by Rent–A–Center. However, this undisputed fact, coupled with the two terminations and one management replacement does not alone support a definitive conclusion that there was no continuity of the work force or that there was a dissimilarity of jobs and working conditions and supervisory personnel pre and post sale.[10]

---

10. It would be an easy way of skirting FMLA responsibility as a successor, indeed, if all

was required was some minor reshuffling well

In its efforts to obtain summary disposition of this claim Rent–A–Center simply has not presented the court with sufficient credible evidence by which it can make the totality of the circumstances determination on this successor in interest question Ignoring other factors entirely, it has only tweaked a few of the factors, often with questionable record support. In fact, based on this record it appears that there may well have been a continuity of business operations after the sale, there is no indication that Rent–A–Center did not use the same retail sites, and it appears, based on the discussion of the account manager's position, that it offered the same products and services as Wilson Enterprises. Certainly "appearances" such as these are not a factual basis for denying or granting summary judgment but they do demonstrate that Rent–A–Center, as the movant on this ground, has not carried its burden with respect to this analysis. *Compare Vanderhoof v. Life Extension Inst.*, 988 F.Supp. 507, 512–14 (D.N.J.1997) (undertaking a thorough analysis of the successor in interest question guided by the 29 C.F.R. § 825.107(a) factors, concluding that defendant was a successor in interest); *Rhoads v. FDIC*, 956 F.Supp. 1239, 1252–54 (D.Md.1997) (same), *reversed on other grounds* by 257 F.3d 373 (4th Cir. 2001); *see also id.* at 1254 ("Just as the RTC was *the successor in interest to the assets* of SFSB, it should also be required to stand in the shoes of SFSB with regard to employees who continued their work after the intervention of the RTC.")

Thus I conclude that Rent–A–Center is entitled to summary judgment on Carlson's MFMLA claim because fewer than fifteen individuals were employed at Carlson's job site. I further conclude that Rent–A–Center is not entitled to summary judgment on Carlson's FMLA claim.

---

after (as opposed to in immediate proximity)

*Conclusion*

For the reasons articulated above I recommend that the Court **GRANT** Rent–A–Center summary judgment on Carlson's claims under the American with Disabilities Act and the Maine Human Rights Act. With regards to Carlson's denial of leave claims, I recommend that the Court **GRANT** judgment to Rent–A–Center on Carlson's Maine Family and Medical Leave Act claim and **DENY** Rent–A–Center summary judgment on Carlson's federal Family and Leave and Medical Act claim.

*NOTICE*

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

December 20, 2002.